UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cr-20290-BLOOM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ERIC DEAN SHEPPARD,

    Defendant(s).
_____/

## ORDER ON RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

**THIS CAUSE** is before the Court on Defendant Eric Dean Sheppard's ("Defendant") Rule 29 Motion for Judgment of Acquittal, ECF No. [162] ("Motion"). The Government filed a Response, ECF No. [165], and Sheppard filed a Reply, ECF no. [166]. The Court has reviewed all supporting and opposing submissions, the record in this case, the applicable law, and is fully advised. For the following reasons, the Motion is denied.

**I.    BACKGROUND**

The Court has previously set forth background on the above-styled action, *see* ECF Nos. [40], [111], [121], [123], and assumes the parties' familiarity with the facts. In the operative indictment, Sheppard is charged with nine counts of Wire Fraud, in violation of 18 U.S.C. § 1343. *See* ECF No. [60] at 7 ("Superseding Indictment"). Counts 1 through 3 relate to three wire transmissions relating to an application for an Economic Injury Disaster Loan ("EIDL") for HM Four, LLC ("HM Four"), a Florida limited liability company with its principal address in either Miami, Florida or Bal Harbour, Florida. Counts 4 through 8 concern wires relating to a "second draw" application for a Paycheck Protection Program ("PPP") loan for HM-UP Development

Alafaya Trails, LLC ("Alafaya Trails"), a Florida limited liability company with its principal address in either Miami, Florida or Bal Harbour, Florida. Count 9 concerns a wire relating to a PPP loan application for HM Management and Development, LLC ("HMMD"), a Florida limited liability company with its principal address in either Miami, Florida or Bal Harbour, Florida.

The Superseding Indictment also charges Sheppard with five counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1) and (2). *See id.* at 8. Count 10 concerns the use of the "means of identification"—i.e., the name and signature—of M.S., the former president of an entity called Mattress One, in an allegedly false and fraudulent lease agreement between Mattress One as tenant and HM Four as landlord ("Lease"), which was submitted to substantiate HM Four's EIDL application. Count 11 concerns the use of the means of identification of H.B., a former branch manager of a bank formerly known as Suntrust Bank. Specifically, the Government alleges Sheppard forged a fraudulent letter that was submitted in lieu of a bank statement ("Bank Letter"). That Bank Letter was submitted in lieu of a bank statement and in response to a request by the Small Business Administration (SBA), the U.S. government agency that administers the PPP and EIDL programs, for a bank statement to verify HM Four bank's account with Suntrust. Counts 12 through 14 concern the use of the means of identification of Neal Cupersmith, Sheppard's longtime accountant—i.e., his name, signature, or Preparer Tax Identification Number ("PTIN")—as part of Sheppard's submission of allegedly false and fraudulent Form 1065 tax filings in support of Alafaya Trails's second draw PPP loan application and HMMD's PPP loan application.

In the Motion, Sheppard moves for judgment of acquittal as to wire fraud Counts 4 through 9. In support, Sheppard first argues the Government has failed to prove a necessary element of Wire Fraud—the existence of a "scheme to defraud" the banks or bank processors ("Lenders") who processed the applicable applications—because it has not proven a scheme that is intended to

cause an economic harm or loss of property on the Lenders, as opposed to a scheme intended merely to deceive Lenders. *Id.* at 16-20. Sheppard relies on *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) for this assertion, a case where the Eleventh Circuit explained that "if the defendant does not intend to harm the victim – 'to obtain, by deceptive means, something to which [the defendant] is not entitled' – then he has not intended to defraud the victim." *Id.* at 1313 (quoting *United States v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011)).

Second, Sheppard argues the Government has failed to provide any evidence that a "traditional property interest" is implicated by the funding by the Lenders of the PPP loans at issue in this case, even if the Government proved Sheppard deprived the Lenders of information that was necessary for them to properly evaluate the loan applications, relying on the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306, 308 (2023). *Id.* at 16, 18-19.

Sheppard also moves for judgment of acquittal as to the Aggravated Identity Theft counts, Counts 10 through 14. In support, Sheppard makes three distinct but interrelated arguments. First, Sheppard argues there has been no evidence that Sheppard fabricated the Lease, the Bank Letter, or the Form 1065s. ECF No. [162] at 7-8. Sheppard also argues his use of the means of identification in this case were not "at the crux" of or a "key mover" in the underlying Wire Fraud counts, as required by the United States Supreme Court's decision in *Dubin v. United States*, 599 U.S. 110 (2023). *Id.* at 13-14. Third, Sheppard contends there was no proof presented at trial that these alleged fraudulent documents were used to inure to Sheppard's personal benefit. *Id.* at 14-15.

The Government responds *inter alia* that the evidence presented during its case in chief is sufficient to sustain a conviction as to Counts 1 through 9. In support, the Government first maintains it has proven a scheme to defraud because loan proceeds—whether received in the form

of a potentially forgivable loan or a 1%-interest loan—is a traditional property interest that implicates the Wire Fraud statute. ECF No. [165] at 4. Second, the Government contends the evidence supports that Sheppard submitted false documentation to obtain disbursement of PPP loan proceeds. *Id.* at 4-7. It also contends there is evidence that such documentation was not submitted mistakenly or because of confusion. *Id.* That evidence demonstrates Sheppard's intent to deceive the Lenders in order to cause them to disburse the loan proceeds.

On the Aggravated Identity Theft counts, the Government maintains that Sheppard's forgeries had a "genuine nexus" to the scheme in that he used the forged signatures to try to deceive the lenders and the SBA into giving him loans he knew he was not entitled to, meaning that the evidence in this case supporting those counts satisfy *Dubin*. *Id.* at 15-21.

Sheppard replies in relevant part that, based on the testimony presented at trial, the Government has failed to adduce evidence that Sheppard stole H.B. or M.S.'s identities.

## II.  LEGAL STANDARD

Rule 29 provides in relevant part:

> (a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.
> (b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.
> (c) After Jury Verdict or Discharge.
>> (1) *Time for a Motion.* A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.

> (2) *Ruling on the Motion.* If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

Fed. R. Crim. P. 29.

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant may also "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2).

When deciding a motion under Rule 29, the district court must determine "whether the evidence, examined in the light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *United States v. Williams*, 390 F.3d 1319, 1323-24 (11th Cir. 2004) (citing *United States v. Varkonyi*, 611 F.2d 84, 85-86 (5th Cir. 1980)). Thus, the test is whether a reasonable jury could find, beyond a reasonable doubt, that the defendant is guilty of violating the crimes alleged in the indictment. *United States v. Macko*, 994 F.2d 1526, 1532 (11th Cir. 1993). Applying this test, "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 611 F.2d at 1323 (citing *United States v. Gianni*, 678 F.2d 956, 958-59 (11th Cir. 1982) and *United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979)). Because a jury may choose among reasonable constructions of the evidence, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 1324 (quoting *United*

5

*States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990); *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983)). "A conviction must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012) (citation omitted).

### III. DISCUSSION

The Court first addresses Sheppard's arguments with respect to Counts 4 through 9, then addresses his arguments with respect to the Aggravated Identity Theft counts.

**A. Wire Fraud (Counts 1 through 9)**

The Eleventh Circuit has stated that, to sustain a conviction for Wire Fraud under 18 U.S.C. § 1343, the Government must prove that a defendant: "(1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud." *United States v. Machado*, 886 F.3d 1070, 1082-83 (11th Cir. 2018) (citation omitted). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citation omitted). The Supreme Court has held that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Ciminelli*, 598 U.S. at 309. "An intent to defraud may be found when the defendant believed that he could deceive the person to whom he made the material misrepresentation out 'of money or property of some value.'" *Maxwell*, 579 F.3d at 1301 (citing *United States v. Cooper*, 132 F.3d 1400, 1405 (11th Cir. 1998) and *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002)). "A misrepresentation is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.'" *Id.* at 1299 (quoting *United States v.*

*Hasson*, 333 F.3d 1264, 1270 and n.7 (11th Cir. 2003)). "Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement." *See United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999) (citation omitted). Moreover, "[b]ecause the focus of the mail fraud statute . . . is on the violator, the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud. Proof that a defendant created a scheme to deceive reasonable people is sufficient evidence that the defendant intended to deceive." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009).

Sheppard argues that his alleged conduct does not fall within the ambit of Wire Fraud because it does not implicate a traditional property interest, i.e., money or property, as required by *Ciminelli*, but that argument is without merit. Specifically, Sheppard contends that the alleged falsity of information given to the Lenders and the SBA in connection with a loan application process is irrelevant for the purposes of proving wire fraud. ECF No. [162] at 18. However, that contention overlooks that this case involves the disbursement of loan proceeds from Paypal/WebBank, ACAP-SME/Northeast Bank, and Cross River Bank. Sheppard does not argue, nor can he, that loan proceeds are not "money or property" within the meaning of the Wire Fraud statute. *See, e.g.*, *United States v. Vernon*, 593 F. App'x 883, 889 (11th Cir. 2014) (finding the Government provided sufficient evidence of defendant's intent to participate in a scheme to defraud as part of a wire fraud where defendant received $114,211.33 in loan proceeds).

Accordingly, the Court considers whether there is sufficient evidence that Sheppard intended to harm the Lenders and finds that the evidence indeed is sufficient.

7

     **i.    Counts 1 Through 3**

With respect to the HM Four EIDL application (Counts 1-3), the evidence is sufficient to support a conviction. The tax returns admitted into evidence demonstrate that HM Four had a 99% ownership stake in Alafaya Trails in 2019 and 2020. However, an EIDL application for Alafaya Trails contradicts that representation because it states Alafaya Trails was not owned by another entity. Also, Sheppard submitted HM Four's EIDL application under his wife's name, Jennifer Sheppard, as 80% owner of the company, a fact that HM Four's tax returns also contradict, and the application reported $950,000 in gross revenues, $250,000 in cost of goods sold, and $450,000 in lost rents, for the 12 months ending January 31, 2020. Yet HM Four's tax returns show that HM Four had no operations, income, or expenses of its own. Nevertheless, it reported 99% of Alafaya Trails's income or losses. That evidence supports that the HM Four EIDL application contained false information concerning HM Four's business operations. It also supports—in the light most favorable to the Government—that Sheppard intended to fool Nationwide and Suntrust Bank into disbursing EIDL funds by misrepresenting that HM Four was a company with workers and income. In other words, the tax records indicate that Sheppard intended to "double dip" from the EIDL program, once with the Alafaya Trails EIDL loan application, and again with the HM Four loan application.

In his Reply, Sheppard argues that a judgment of acquittal is warranted as to Counts 1 through 3 because "[t]he Government's argument, focusing on the Lease and Bank Letter which were not required or considered by the SBA, demonstrates it has no evidence of a material misrepresentation in the HM Four EIDL loan." ECF No. [166] at 10. However, that argument ignores the evidence of the tax records set forth above, and there is evidence presented at trial that tax records were material to the EIDL and PPP loan applications.

Regardless, Sheppard is incorrect that the Bank Letter and the Lease are not material because the SBA did not request those documents and were unnecessary for the loan application. As the SBA notes in evidence indicate, the Lease was submitted in response the SBA's request to produce proof that HM Four had business operations, and the Bank Letter was submitted in lieu of a bank statement, which the SBA requested to verify that the account with Suntrust Bank was associated with the business. As such, this is not a case where Sheppard included those documents with the original application when he submitted it on October 22, 2020. Rather, those documents were submitted in response to the SBA's requests, supporting that Sheppard intended that those documents influence the SBA's decision to approve the EIDL application. Whether the Bank Letter or Lease actually influenced any person's decision is irrelevant to the materiality inquiry. Accordingly, the submission of the Bank Letter and Lease satisfies the materiality requirement.

    **ii.   Counts 4 Through 9**

With respect to the PPP loans (Counts 4-9), based on the testimony of Philip Palmer of the IRS, Neal Cupersmith and Tamara Och of the Florida Department of Revenue, together with the tax filings in this case, the evidence supports that Sheppard submitted false documentation for all the PPP loan applications because they misstated the number of employees that were on payroll at Alafaya Trails and HMMD. Moreover, there was evidence—in the light most favorable to the Government—that the documentation was false in that it mislabeled those companies' independent contractors as wage employees. Further, the testimony and the records from the Lenders support that they received no information or documents that would show that these companies employed independent contractors, as opposed to wage employees, such as Forms 1099 for non-employee compensation. The absence of the submission of Form 1099s supports that Sheppard was not mistaken or confused about the necessity for Alafaya Trails and HMMD to employ W-2 employees

to be eligible for PPP funds. Considered as a whole, the evidence supports that Sheppard purposely mischaracterized the nature of his workers' employment relationship with his companies to obtain loan proceeds.

Other evidence supports that conclusion. For instance, the evidence shows that there was a reduction in the number of employees Sheppard provided to PayPal on February 23, 2021 (from 80, to 74, down to 19), and to Cross River Bank on March 12, 2021 (from 23 down to 18), and the SBA and Lender witnesses testified that the SBA put in place a moratorium in February 2021 directing the lenders to process only applications from businesses with fewer than 20 employees. That evidence, in the light most favorable to the Government, supports that Sheppard manipulated the number of employees to convince the Lenders and the SBA that he employed fewer than 20 employees in order to cause them to approve the loans and send him the loan proceeds. Accordingly, the evidence is sufficient to show Sheppard's scheme to defraud and his intent to defraud. Because the Court finds that the evidence is sufficient that he intended to harm the lenders, his reliance on *Takhalov* is misplaced. Moreover, contrary to Sheppard's argument, *see* ECF No. [162] at 19 (arguing there was no harm or injury to the Lender), it is irrelevant whether the lenders were actually harmed; the Wire Fraud statute requires that the Government show Sheppard had the intent to harm the Lenders, here by causing them to issue loan proceeds, not to show direct harm to the Lenders.

Accordingly, judgment of acquittal on Counts 1 through 9 of the Superseding Indictment is not warranted.

### B. *Dubin* (Counts 10 through 14)[1]

Because the parties provided extensive briefing on the applicability of *Dubin* to the Aggravated Identity Theft counts, the Court first turns to that case. *Dubin* considered the meaning of the words "use" and "in relation to" in the Aggravated Identity Theft statute, which provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A.

The defendant in *Dubin* helped his father manage a psychological services company. *Dubin*, 599 U.S. at 114. The company submitted a claim for reimbursement to Medicaid for psychological testing by a licensed psychologist. *Id.* That claim overstated the qualifications of the employee who actually performed the testing, resulting in a higher Medicaid payout. As a result, the defendant was charged not only with healthcare fraud, but with Aggravated Identity Theft because the defendant's fraudulent billing included a patient's Medicaid reimbursement number, which is a "means of identification" under § 1028A. *Id.* at 115.

The Supreme Court explained that "identity theft is committed when a defendant uses the means of identification itself to defraud or deceive." *Id.* at 123. The Court held that the defendant did not commit aggravated identity theft because his use of the patient's name "was not at the crux of what made the underlying overbilling fraudulent." *Id.* Instead, "[t]he crux of the healthcare fraud was a misrepresentation about the qualifications of [defendant's] employee. The patient's name was an ancillary feature of the billing method employed." *Id.*

---

[1] Sheppard argues that there is no evidence that any loan proceeds were used to obtain a personal benefit, but neither the statute nor *Dubin* requires that those proceeds be used for a personal benefit. The Court thus rejects that argument.

11

As the Court has previously explained, the holding of *Dubin* does not reach the charged conduct. *See* ECF No. [121]. This is not a case where the Government charged Sheppard with Aggravated Identity Theft for his use of the means of identification of his companies' customers. That sort of use falls within *Dubin*'s holding and would be ancillary to the Wire Fraud. Rather, the crux of the Wire Fraud in this case is Sheppard's misrepresentation about the nature of his worker's employment relationship, i.e., whether those workers were employees or independent contractors, and the Forms 1065, the Bank Letter, and Lease directly relate to that misrepresentation.

As such, a threshold issue is what conduct satisfies *Dubin*'s requirement that a means of identification be itself used to defraud or deceive for the underlying conduct to give rise to aggravated theft liability. The Eleventh Circuit has set forth guidance in *Gladden*. In that case, defendants Linton, Gladden, and several others at a company called Global Compounding Pharmacy (Global) received inflated reimbursement payments by billing for medically unnecessary and fraudulent prescriptions. *United States v. Gladden*, 78 F.4th 1232, 1238 (11th Cir. 2023). Most pertinent here, Linton obtained a prescription for additional medications on behalf of Robert Bowen, the husband of Joshlyn Bowen, a Global sales representative, through the fraudulent use of the means of identification of Dr. John Almirol, a physician who treated Robert Bowen as a patient. *Gladden*, 78 F.4th 1232, 1245 (11th Cir. 2023). Dr. Almirol had signed and authorized a prescription for Robert Bowen. *Id.* at 1239. After emailing with Joshlyn Bowen, Linton fraudulently altered the already-signed prescription to permit Global to bill for additional medically unnecessary drugs without Dr. Almirol's knowledge. *Id.* In other words, Linton affirmatively represented to the insurance companies and pharmacy benefit managers (PBM) that Dr. Almirol had authorized the additional prescriptions when, in fact, he had not. *Id.* at 1245.

The Eleventh Circuit held that Linton's conduct fell within the purview of the Aggravated Identity Theft statute. *Id.* The Eleventh Circuit explained that

> Linton's use of Dr. Almirol's means of identification is distinct from the conduct at issue in *Dubin*, where the defendant misrepresented only the qualifications of the professional who performed psychological testing on a patient to increase the reimbursement from Medicaid. Linton's use of Dr. Almirol's identity was central to the deception: she used his means of identification itself to defraud or deceive. The insurance companies and PBMs would not have provided reimbursement had they known that Dr. Almirol had not actually authorized the prescriptions. . . . Thus, because Dr. Almirol's signature on the prescription form directly enabled Linton to bill for the medically unnecessary products, the means of identification specifically [was] a key mover in the criminality. In short, unlike in *Dubin*, Linton did not provide a service to a client while merely misrepresenting how the service was performed to inflate the bill. Rather, Linton used the means of identification of former patients and prescribing doctors to overbill for certain products. Linton's conduct thus falls squarely within the classic variety of identity theft left untouched by *Dubin*.

*Id.* at 1245-46 (11th Cir. 2023) (internal citations and quotation marks omitted).

In this case, Sheppard's use of the means of identification of Neal Cupersmith, M.S., or H.B. would be "in relation to" or "at the crux" of the Wire Fraud if that identification were used in a scheme to defraud the lenders of loan proceeds. The evidence supports that he has done so. That is because, in the light most favorable to the Government and as set forth below, the tax filings, the Lease, and the Bank Letter were false and used to induce the Lenders to disburse loan proceeds, specifically by seeking to deceive them that Sheppard's companies were entitled either to PPP or EIDL funds. As such, Sheppard's use of those individuals' means of identification is at the crux of the Wire Fraud. It is irrelevant whether their use was necessary to the loan applications or whether the use of those means of identification did in fact cause the disbursement of loan proceeds. That is because neither the language of the Aggravated Identity Theft statute nor the reasoning in *Gladden* impose such requirements.

Sheppard points to the portion of *Gladden* quoted above to argue that *Dubin* imposes a necessity requirement. *See* ECF No. [162] at 10 (reasoning in part that the alleged use of identity is what resulted in the crime in *Gladden* because, in that case, "the patient and doctor's identifying information was necessary to fill the prescriptions."), but Sheppard misreads *Gladden*. That case applied *Dubin*, a case where—as Sheppard recognizes—the Supreme Court expressly stated that "being at the crux of the criminality requires more than a causal relationship, such as '"facilitation"' of the offense or being a but-for cause of its 'success.'" *Dubin*, 599 U.S. at 131. In other words, in defining the statutory meaning of the word "use", *Dubin* did not require that the Government prove that the use of a means of identification in a fraud case was necessary to effectuate the underlying fraud, or that the identity theft contributed to the ultimate success of the underlying fraud, in order for a defendant to be liable under § 1028A. Rather, *Dubin* emphasized the requirement that the particular "use" of a means of identification fit within the ordinary meaning of "identity theft." *See id.* at 122 (explaining how "identity theft" has a focused meaning that comports with dictionary definitions of the concept). Because *Dubin* does not impose a requirement to prove the necessity of the identity theft to the underlying scheme to defraud, it follows that *Gladden* did not impose any such requirement either.

The focus of the Court's inquiry is thus whether the evidence supports that Sheppard "used" the means of identity within the meaning of § 1028A—that is, use that fits within the ordinary meaning of identity theft, as opposed to any other form of use—not whether that "use" was "at the crux" of the wire fraud, whether the identity theft was necessary to the loan application process, or whether it was actually successful.

Applying that analysis, the Court finds that the evidence is sufficient to support a conviction as to Counts 12 through 14. Neal Cupersmith testified that he did not authorize the use

of his name, signature, or PTIN on forged income tax returns that the Sheppard submitted to the lenders to support the PPP loan applications. Neal Cupersmith testified that he had prepared the Sheppard's and all his companies' tax returns essentially for the entire time Sheppard has been in business, 20-25 years. As such, the Court finds the evidence is sufficient for a jury to find that Sheppard used Neal Cupersmith's means of identification with his knowledge or consent.

Turning to Count 10, M.S. testified that the Lease, admitted as Government's Exhibit 58-1, was a lease agreement made and entered into by and between HM Four and Mattress One. M.S. further testified that the FBI showed him this lease during a 2022 interview and that he assumed it was a "lease that had been the actual lease." M.S. stated that he "immediately noticed that [his] name was misspelled [o]n the lease," that it had no initials on any pages, and that the signature on the document was not his signature. Specifically, the lease was purportedly signed by an individual with a first name that differed from M.S.'s first name by one letter. M.S. further stated that he did not authorize Sheppard or anyone on his behalf to sign his name on the document. In the light most favorable to the Government, the evidence supports that Sheppard forged M.S.'s signature on a false lease agreement and that Sheppard misspelled M.S.'s name in doing so. That finding supports that Sheppard submitted a false and forged document with the November 4, 2020 EIDL HM Four application, a finding that would sustain a conviction as to Count 10. Accordingly, a judgment of acquittal as to Count 10 is not warranted.

As for Count 11, the Government urges that the pertinent facts at trial support that H.B. testified that he did not sign the Bank Letter that was attributed to him, and his practice would have been to only mention the signer on the account in the letter and not include the name of the Defendant's wife). ECF No. [165] at 12. However, when shown the Bank Letter as Government's Exhibit 58-3, H.B. stated that the signature on the document is "similar to mine, but I don't believe

it's mine." However, H.B. also testified that he did not *recall* whether he prepared or signed the Bank Letter—not that it was forged. A conviction on Count 11 cannot be sustained on that testimony alone; however, other evidence, when viewed in the light most favorable to the Government, requires that the Court deny the Motion as to that Count.

H.B. testified that Sheppard was the "signer" on the Suntrust account for HM Four. The account had no other individuals who possess authority over the account based on the presence of a signature card. H.B. further testified that "[y]ou wouldn't type a letter with false information. On purpose." Nevertheless, the Bank Letter, which concerned only the Suntrust Account in question, states that "Eric Sheppard and *Jennifer Sheppard* are valued customer[s] of Suntrust Bank", which cannot be true as Jennifer Sheppard lacked signature card authority over that account, even if, as H.B. testified, that Jennifer Sheppard had other accounts at Suntrust Bank. In the light most favorable to the Government, that testimony supports that the Bank Letter misrepresents Jennifer Sheppard as a person with signature card authority over the Suntrust Account at issue. Given the falsity of that letter and that H.B. would not knowingly endorse a false letter, the absence of H.B.'s recollection supports that H.B. did not sign the Bank Letter, consistent with Sheppard forging H.B.'s signature on the Bank Letter. For that reason, acquittal as to Count 11 is not warranted.

## IV.   CONCLUSION

Having found that judgment of acquittal is not warranted as to any of the Counts of the Superseding Indictment, it is **ORDERED AND ADJUDGED** that the Defendant's Rule 29 Motion for Judgment of Acquittal, **ECF No. [162]**, is **DENIED**.

Case No. 22-cr-20290-BLOOM

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 5, 2024.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record