UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 22-20290-CR-BLOOM/OTAZO-REYES

UNITED STATES OF AMERICA,

vs.

ERIC DEAN SHEPPARD,

   Defendant.
_____/

### DEFENDANT'S REPLY IN SUPPORT
### OF MOTION FOR JUDGMENT OF ACQUITTAL

  Defendant Eric Dean Sheppard, by and through undersigned counsel, pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, respectfully submits this reply brief in support of his motion for acquittal [D.E. 205], and states as follows:

### INTRODUCTION

  Sheppard's convictions for aggravated identity theft should be vacated under *Dubin v. United States*, 599 U.S. 110 (2023). Dubin holds that the use of someone's identity constitutes aggravated identity theft only when it is "at the crux" of the underlying crime. Here, the underlying crime is wire fraud. At the crux of that crime were misrepresentations about Sheppard's businesses' eligibility for PPP loans. According to the government, Sheppard used his accountant's identity to "lend credibility" to those misrepresentations. But lending credibility to a fraud, by definition, cannot be at its crux. Sheppard's alleged misrepresentations about his accountant's identity are not what "made the [underlying] conduct fraudulent." *Id*. at 132. This fatal defect requires judgment of acquittal on the aggravated identity theft convictions. In addition, there was no evidence that the use of the accountant's identity even "len[t] credibility" to the misrepresentations about Sheppard's businesses. The government identifies no such evidence in its opposition. Sheppard's aggravated identity theft convictions should be vacated for this reason as well.

  Sheppard's wire fraud convictions should be vacated because he did not devise a scheme to harm to a traditional property interest. In its response brief, the government argues that Sheppard defrauded either the Small Business Administration ("SBA") or the lending banks. Neither

argument works. Sheppard did not obtain any property from the SBA—he did not obtain the SBA's money, nor did he obtain loan guarantees the SBA made to the banks. And the banks got exactly what they bargained for: Sheppard's misrepresentations about his businesses' eligibility to participate in PPP were not material to the banks' financial interest (i.e., property interest) in the transaction. They bargained for and received loans that are being repaid according to their terms, in addition to processing fees. To be sure, the government claims that its regulatory interest in controlling access to the PPP program was thwarted. But such a harm cannot support a wire fraud conviction.

For these and the reasons set out below, the Court should enter a judgment of acquittal on all counts of conviction.

## DISCUSSION

I.  **SHEPPARD'S AGGRAVATED IDENTITY THEFT CONVICTIONS ARE INVALID**

   A.  **A Lie That Merely "Supports" A Fraud Is Not "At The Crux" Of The Fraud**

The Supreme Court's decision in *Dubin* requires a careful evaluation of the relationship between the defendant's use of someone's identity and the underlying fraud. Under *Dubin*, a defendant is guilty of aggravated identity theft only when his use of someone's identity "is at the crux of what makes the conduct criminal." 599 U.S. at 131. Here, the dispositive question is whether Sheppard's use of Cupersmith's identity "is at the crux of" his wire fraud.

There is no dispute about the crux of the government's case for wire fraud. As the Court has already held, "the crux of the Wire Fraud in this case is Sheppard's misrepresentations about the nature of his worker's employment relationship, *i.e.*, whether those workers were employees or independent contractors." [D.E. 170 at 12]. The government's opposition brief confirms this understanding: at the crux of the fraud were lies about having W2 employees and the nature of Sheppard's businesses. [D.E. 214 at 12-20; *see also* D.E. 215 at 5].

The government's theory is that Sheppard committed aggravated identity theft because he used Cupersmith's identity to "lend credibility," [01/11/24 Tr. AM (Closing Arg) at 18]; *see also* [D.E. 214 at 26], to loan applications that, again, were fraudulent because they misrepresented the characteristics of Sheppard's businesses. That is not aggravated identity theft under *Dubin*. By definition, a lie that provides "support[]" for a fraud, [D.E. 214 at 13, 25], is not "at the crux" of the fraud. In common parlance, "crux" means "a main or central feature," (Merriam-Webster's

2

Collegiate Dictionary, *Crux,* 11th ed. 2020), "a crucial point," (Merriam-Webster Dictionary, *Crux*, 2023), or "the most important" part, (Oxford Advanced Learner's Dictionary, *Crux,* 10th ed. 2020). In the words of *Dubin*, the defendant's use of the identity must be "a key mover in the" fraud and play a "central role." 599 U.S. at 123. Conduct that merely supports or lends credibility to a fraud does not satisfy any of these definitions. It would stretch the English language beyond its breaking point to argue, as the government does, that providing support for a fraud is also at the crux of the fraud. *See, e.g.*, [D.E. 214 at 27]. "Crux" and "support" are mutually exclusive.[1]

At the same time *Dubin* announced this crux-of-the-fraud test, the Court also made expressly "clear" that "being at the crux of the criminality requires more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its 'success.'" *Id*. at 131. Yet that is exactly what the government's credibility/support theory argues. In the government's view, the banks were more likely to approve Sheppard's loan applications because Cupersmith's identity (in truth, his professional certification as an accountant, not his personal identity) allegedly "lent credibility" to Sheppard's *other* lies about the *nature of his businesses*. [D.E. 214 at 24-25, 27]. If there was evidence that the use of the accountant's name had this effect, Cupersmith's identity may have "facilitate[d]" the fraud. *See* Black's Law Dictionary, *Facilitate* ("To make the commission of (a crime) easier."). The government told the jury that Sheppard forged Cupersmith's signature to "move [the] fraud along." [01/11/24 Tr. AM (Rebuttal Arg) at 18]. But under *Dubin*, that is simply not enough.

The government's contrary argument misreads *Dubin*. The government contends that it was sufficient that Sheppard "used Mr. Cupersmith's identity in a manner that was fraudulent or deceptive." [D.E. 214 at 25]. In other words, the government says that Section 1028A applies whenever a defendant satisfies the common definition of "identity theft." But Section 1028A does not punish common "identity theft," nor is it a general anti-forgery statute. *See* [D.E. 205 at 4]. It

---

[1] If the government is right about the record, there is a better word to describe Sheppard's alleged use of Cupersmith's identity: "ancillary." Ancillary means supplementary or subordinate. *See* Black's Law Dictionary, *Ancillary* (11th ed. 2019). On the government's theory, Sheppard's use of Cupersmith's identity was supplementary to the fraud in that it was an added reason the fraud might ultimately succeed—in the government's view, the banks were more likely to credit lies about W-2 wages if they appeared on a form signed by an accountant. And the use of Cupersmith's identity was subordinate in the sense that it was secondary to alleged lies about the nature of his businesses, which everyone agrees was the "crux" of the fraud. *Dubin* held that an "ancillary" use of someone's identity is not aggravated identity theft. 599 U.S. at 132.

3

punishes *aggravated* identity theft, which means identity theft committed "during and in relation to" a predicate crime. 28 U.S.C. § 1028A; *Dubin*, 599 U.S. at 123-24, 127-28. That is why the statute requires a mandatory, consecutive, two-year prison term. And in *Dubin*, the Supreme Court held that a defendant uses someone's identity "during and in relation to" a predicate crime only where that use is "at the crux of what made the underlying [conduct] fraudulent." 599 U.S. at 131-32. Thus, even if Sheppard lied about Cupersmith's identity, the Court still must find that this lie was "at the crux of" the wire fraud. And for all reasons just described, this Court cannot do so.[2]

The Eleventh Circuit's decision in *United States v. Gladden*, 78 F.4th 1232 (11th Cir. 2023), cannot save the government's conviction. The government first asserts that *Gladden* did not ask whether the defendant's "misuse of several doctor's names was *the* crux" of the criminality, "but rather whether her misuse was *at the crux*" of the criminality. [D.E. 214 at 23]. If there is a difference between "the crux" and "at the crux," it is not material to this case.[3] Sheppard's use of Cupersmith's identity was no more "at the crux" of the wire fraud than it was "the crux" of the wire fraud. The government's point seems to be that there can be multiple cruxes of a fraud. [D.E. 214 at 23]. We agree. The problem for the government is that Sheppard's use of Cupersmith's identity was not one of them—at the risk of repetition, the cruxes of the wire fraud here were misrepresentations about W-2 employees and the industry in which Sheppard's businesses operated, not Cupersmith's identity.

That distinguishes this case from *Gladden*. As the government notes, the defendant in *Gladden* lied about "by <u>whom</u> certain prescriptions were authorized" and whether "they were medically necessary." [D.E. 214 at 23]. Both lies were at the crux of the fraud because insurance

---

[2] In the Court's January 5 Order, the Court stated "[t]he focus of the Court's inquiry" was on "whether the evidence supports that Sheppard 'used' the means of identity within the meaning of § 1028A—that is, use that fits within the ordinary meaning of identity theft, as opposed to any other form of use—not whether that 'use' was 'at the crux' of the wire fraud." [D.E. 170 at 14]. Respectfully, that analysis is incorrect for the same reason the government's argument is incorrect. Under *Dubin*, the focus must be on whether Sheppard's use of Cupersmith's identity was at the crux of the wire fraud. The commission of ordinary identity theft is not enough.

[3] In attempting to draw this distinction, the government is picking up on "some definite-article inconsistency," noted by Justice Gorsuch in his concurrence (which would have invalidated Section 1028A as vague). *Dubin*, 599 U.S. at 135 (Gorsuch, J., concurring). It is true that the Court used the verbal formulation "at the crux," but it is also true that the Court used the phrase "the crux." *Dubin*, 599 at 132. That the Court used these formulations interchangeably and rejected Justice Gorsuch's concurrence shows that the phrases are meant to mean the same thing.

4

companies will not reimburse prescriptions unless they are authorized by a doctor and are medically necessary. In this way, the defendant's "use of Dr. Almirol's identity was central to the deception"—the underlying conduct was fraudulent in part because the defendant lied about *who* wrote the prescription. *Gladden*, 78 F.4th at 1245. But that is not this case. Sheppard did *not* commit wire fraud because he lied about who his accountant was. The government claimed he committed wire fraud because he allegedly lied about the nature of his businesses. In the government's words, Cupersmith's identity played a "supporting," [D.E. 214 at 25], not "central" role in the fraud, *Gladden*, 78 F.4th at 1245.

This Court should not endorse a conviction that is out of step with every relevant appellate precedent. Because Sheppard's alleged "use of [Cupersmith's] name was not at the crux of what made [his PPP loan applications] fraudulent," his convictions must be vacated. *Dubin*, 599 U.S. at 132.[4]

### B. As A Matter Of Fact, Cupersmith's Identity Did Not Lend Support To The Fraud

Sheppard's aggravated identity theft convictions should also be vacated because the government's interpretation of the evidence is unsupported. The undisputed facts at trial establish that Cupersmith's name played *no* causal role in the fraud. And because it played no causal role, it cannot possibly be "at the crux" of the fraud. The prosecution here is thus considerably weaker than the one in *Dubin*, where the defendant's use of his patient's identity was at least a necessary, but-for cause of the fraud's success.

*1. No one relied on the tax forms on which Cupersmith's name appeared*. As Sheppard demonstrated in his motion, there was no evidence that the tax forms containing Cupersmith's identity were relied on by either bank. [D.E. 205 at 8-13]. The government's opposition brief leaves this argument substantively unrebutted.

<u>Northeast Bank / ACAP</u>. To start, there was no evidence Northeast Bank even *requested* the tax form on which Cupersmith's name appeared. The government speculates that the bank may

---

[4] The government's reliance on *United States v. Fullerton*, 2023 WL 6150782 (W.D. Tex. Sept. 20, 2023), a district court case from outside this circuit, is misplaced. *Fullerton* makes the same mistake as the government. *Fullerton* concluded that it was sufficient that the misuse of someone's identity "lend credibility" to the fraud, *id*. at *4, but there is no way to square that conclusion with *Dubin*. *Fullerton* is also inapt procedurally. *Fullerton* was a motion to dismiss, in which the Court had to take the allegations as true. Here, as discussed below, there is no evidence the accountant's identity played any role in the fraud.

5

have requested the tax form (Form 1065) based on a "guidance tool" [Government Trial Ex. 20-3], which "listed the income tax return as something to be requested and reviewed." [D.E. 214 at 24]. The government relies on the same underwriting materials to argue that the Bank relied on the Form 1065. [D.E. 214 at 14-15]. But as Sheppard has already explained, [D.E. 205 at n.3; 205-1; 205-2],[5] the document shows that the banks would request the K-1[6] relating to the Form 1065 only for PPP applications treated by Northeast as *partnerships*. [*Id*.] In fact, Northeast treated the applicant as a *corporation*, not a partnership, and the underwriting materials for corporations, used by Northeast here, *did not list any part of the Form 1065 as a document to be requested or reviewed*. [*Id*.] The testimony of Toye that Northeast treated the applicant as a corporation, not a partnership, and that no 1065 would be requested or reviewed for applicants treated as corporations is unrebutted, supported by the Northeast documents, and ignored in the government's response.

Even if Northeast had requested a tax document with Cupersmith's name on it, there is no evidence that the bank relied on it (or on Cupersmith's name in particular). The government's claim that the "1065 income tax return using the identity of Mr. Cupersmith" was relied upon [by Northeast] to support false representations concerning payroll, revenue decline, and business type [D.E. 214 at 13] in unsupported and contradicted by the evidence. The government ignores Toye's blanket admission that there was no evidence in the documents that the 1065 was relied upon, quoted in the opening brief. [D.E. 205 at 8-9]. There is no contrary evidence.

As to payroll, as noted above in connection with the underwriting documents, there is no evidence the 1065 was relied upon for this purpose. Moreover, Toye admitted that Northeast relied on the **form 940** (not the 1065), to substantiate average monthly payroll and thus determine

---

[5] [D.E. 205 n. 3]. As shown in the opening brief, the "corporations" tab of the underwriting template was completely filled out by the underwriters, says it is the "correct" tab to underwrite the loan application, and says the loan was "approved" using the "corporations" tab, not the "partnerships" tab; by contrast, the "partnerships" tab of the underwriting template was not filled out by the underwriters, says it is the "wrong" tab, and says the loan was "not approved" using the "partnerships" tab. [D.E. 205 at n. 3; D.E. 205-1, D.E. 205-2]. Toye explained that this meant that Northeast treated the applicant as a corporation, not a partnership, and that the indication in the "partnership" tab to consult the K-1 of the Form 1065 to verify payroll, upon which the Government relies, was inapplicable to the approval of this loan. [*Id.*]. Toye's testimony is unrebutted.

[6] The underwriting document refers to the K-1 of the Form 1065 only. [See Government Trial Exhibit 20-3 at "Partnership" tab, line 36]. The K-1 does not have Cupersmith's identifying information. [*See* Government Trial Exhibit 20-11 at 14-15].

Sheppard's eligibility to participate in the PPP program. [12/5/23 AM (Toye) 44:19-21; 47:22-48:4; 63:11-21]. The form 940 does not contain Cupersmith's identity.

There is also no evidence that the Form 1065 was relied on to verify revenue decline. The government ignores Toye's testimony, cited in the opening brief, that the 1065 return was not needed or used to substantiate loss of revenue to obtain the loan because the loan amount was under $150,000, which meant there was *no requirement to substantiate revenue decline*. [D.E. 205 at 9-10]; *see also* [D.E. 205-2; 205-3]. The Government implicitly admits this, when it argues that revenue decline needed to be substantiated only in a later application for forgiveness, never made on this loan. [D.E. 214 at 16]. The Government also ignored the evidence that Northeast could not have used the Form 1065 to verify revenue decline, because, as shown in the opening brief and ignored by the government, Northeast did not have the previous years' Form 1065 needed to perform such a verification. [D.E. 205 at n.4].

Contrary to the Government's assertion on business type,[7] there is also no evidence that Northeast relied upon the Form 1065 to verify this. As shown in the opening brief, ignored by the government, Toye admitted there was no evidence anyone at the Bank relied upon the 1065 tax return for any purpose. [D.E. 205 at 9].

In sum, the government cites no evidence in support of its contention that the tax forms on which Cupersmith's name appeared was requested or relied on, because there is none. There is thus is *no* evidence that Cupersmith's identity played *any* role—not even a "but-for" causal role, which was insufficient in *Dubin*, 599 U.S. at 131—in getting the loan underlying Count Thirteen approved.

*Cross River Bank*. A similar evidentiary failure plagues the government's case with respect to Count Fourteen. Spencer Lord admitted: (1) there is no evidence that the underwriter or any other person at Cross River read the 1065 return with Cupersmith's identifying information, and (2) that the Cross-River underwriter reviewed and relied on a *different* tax form (that did *not* have

---

[7] The Government appears to argue that Northeast must have looked at the business code used in the Form 1065 submitted by the applicant to verify that the business code in the application was the correct business code for the borrower (on the apparent assumption that tax forms always have the correct business code). [D.E. 214 at 16]. But there is no evidence that Northeast performed this comparison on this loan. There is no evidence Northeast performed this type of comparison on any other PPP loan. There is no evidence that the SBA required PPP lenders to conduct this type of industry code verification against a Form 1065. The argument is speculation, unsupported by fact.

7

Cupersmith's identifying information), to substantiate average monthly payroll and thus PPP eligibility:

> Q. . . . I asked you isn't it a fact that there's no record of anyone reading the 1065 and you said no I think it would be in the UW analysis do you remember that?
> A. Yes.
> Q. And we're looking at the UW analysis here, correct?
> A. Correct.
> Q. And it's not here?
> A. It's not that – they didn't list the 1065 out.
> Q. Is there anything in the record that [would] verify that a single person at cross river actually read the 1065 return?
> A. Not that was specifically notated.
> Q. Okay. And again you don't have personal knowledge, right?
> A. Right.
> Q. **My colleague pointed out something to me that it actually refers to a different form here, correct?**
> A. Correct.
> Q. What form does it refer to?
> A. The 940.
> Q. The 940?
> A. Yes.
> Q. And that shows that the payroll – the underwriters definitely reviewed the 940, right?
> A. Yes.
> Q. **And that's how they verified payroll, right?**
> A. **Yes.**

[12/5/23 PM (Lord) 100:17-111:18]; *see* Ex. D.

In response, the government observes that: "Cross-River initiated a process to verify the tax return by providing defendant an IRS Form 4506-6-T to execute with other closing documents." [D.E. 214 at 20]. Because the Form 4506-T was to be executed at closing, as admitted by the government, the loan was approved and funded *before* Cross-River could use the Form 4506-T to obtain materials from the IRS. Accordingly, the Form 4506-T provides no evidence of what Cross-River relied upon in approving the loan, and certainly does not rebut Lord's testimony that there is no evidence of Cross-River reviewing the form 1065 in approving the loan. And the Government admits there is no evidence that Cross-River acted in any way on the Form 4506-T, even after the loan was closed and funded. *See* [D.E. 214 at 20 (government arguing that "[h]ad Cross River turned to the IRS for verification [by submitting the Form 4506-T to the IRS], it would have received tax return information . . . .") [D.E. 214 at 20].

Not only is there *no* evidence that Cross River Bank reviewed or relied on the Form 1065—the evidence actually shows Cross River could not have done so. At the top left corner of the first page of the Form 1065 is the NAICS business code number of 636220. [See Government Trial Exhibit 22-3 at 1]. Had anyone actually reviewed the Form 1065 or double checked it against the PPP application, they would have seen that the code given on the Form 1065 did not match the code given on the PPP application. [*See* Government Trial Exhibit 22-6 at PDF page 3, listing the NAICS business code number of 236220 on the PPP application]. They would have also noticed that the NAICS number on the Form 1065—636220—is not a number in the NAICS business classification list.  For these reasons, a Cross-River underwriter reviewing the Form 1065 would have flagged the mismatch with the PPP application and that HM Management submitted a Form 1065 with an incorrect NAICS number. That no one did is strong evidence that no one reviewed the Form 1065 at all or relied on it in approving the loan.

In short, the government offered *no* evidence that the documents on which Cupersmith's name appeared played any role in getting his businesses' loan applications approved, and the government is wrong when it says that Cupersmith's identity lent credibility to the fraud. The Government chose to call only hearsay witnesses with no personal knowledge who could testify only about what the documents showed, and those documents did not show any reliance on Forms 1065.  Unlike it *Dubin*, the Forms 1965 were not even "a but-for cause of its success." 599 U.S. at 131 (quotations omitted).

2. *Cupersmith's identity was of no significance*. Even if the government is correct that someone at the banks had relied on the Form 1065's themselves, there is no evidence that Cupersmith's *identity* was "at the crux" of either banks' approval of the PPP loan applications, as demonstrated in the opening brief. [D.E. 205 at 12-13]. There is no evidence that anyone read or took note of whether a CPA's information was on the forms, much less that it played a causal role in the loan approval. Indeed, the 1065 tax forms on which Cupersmith's name appeared did not even require that a CPA be identified. [*Id*.]. For this additional reason, any misrepresentation about Cupersmith's identity most decidedly was not *a* mover, let alone a "key mover," *Dubin*, 599 U.S. at 123, in Sheppard's alleged scheme to convince the banks to approve his loan applications. This, too, requires an acquittal. The government offers nothing in response.

9

### C. The Evidence Was Otherwise Insufficient

In the motion, the defense argued that government provided no evidence of who forged Cupersmith's signature or who submitted the forged returns. [D.E. 205 at 13]. Specifically, there is no evidence that Sheppard forged Cupersmith's name or knew that others did. The government spent substantial time putting on evidence regarding IP addresses, but never in connection with the submission of the forged returns.[8] In the absence of evidence, the government asked the jury to speculate that Sheppard was to blame for the forgeries. The government does not address this argument in its response brief, presumably because it has no explanation for the lack of evidence.

## II. THE GOVERNMENT DID NOT PROVE A SCHEME TO DEFRAUD

### A. The Government Did Not Prove A "Scheme To Defraud"

The Court should also enter a judgment of acquittal on the wire fraud counts. The government did not prove that Sheppard engaged in a "scheme to defraud" the Small Business Administration ("SBA").[9] And the government did not prove that Sheppard engaged in a "scheme to defraud" the banks because they got exactly what they "bargained for." *United States v. Takhalov*, 827 F.3d 1307, 1312 (11 Cir. 2016). The only harm here is regulatory—the federal government had a policy interest in ensuring that PPP loans were made only to certain businesses with W-2 employees [*see* Dkt. 214 at 7]—but regulatory harm cannot, as a matter of law, ground a conviction for wire fraud. [D.E. 205 at 2, 16].

The SBA. The government suggests that the SBA lost two property interests: (i) money (i.e., "U.S. Treasury dollars"); and (ii) guarantees the government made "to lenders" (i.e., the banks). [*See* D.E. 214 at 6-7]. Neither suffices to sustain Sheppard's conviction.

Sheppard did not obtain the SBA's money. The government did not establish that the *SBA* (as opposed to the "U.S. Treasury," [*id.*]) had a property interest in the money on the government side of the PPP program. [D.E. 205 at 16-17]. Sheppard also did not "obtain," 18 U.S.C. § 1343, any government money, even if (by hypothesis) PPP loan money was SBA property. To commit fraud, there must be "an actual" or at least "potential transfer of property from the victim to the

---

[8] For example, Northeast does not know who submitted the forged 1065 or from which IP address it came. [12/5/23 AM (Toye) 18:12-19:4, 49:4-11].

[9] Sheppard was convicted only of counts involving the PPP program. There was no wire fraud charge for the loan for which he received forgiveness. Sheppard was acquitted of all charges related to the EIDL program. Moreover, it is undisputed that Sheppard has been paying back the PPP loans according to their terms.

defendant." *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993). That "is essential." *Id*. In *Sekhar v. United States*, 570 U.S. 729 (2013), for instance, the Court held under the similarly-worded Hobbs Act, 18 U.S.C. § 1951, that obtaining property requires not only that "the victim part with his property," but that the defendant "gain possession of it." *Id*. at 734 (quotations omitted)). Likewise, in *Skilling v. United States*, 561 U.S. 358 (2010), the Court contrasted honest services fraud with traditional "money or property" fraud by noting that money or property frauds involve situations in which "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Id*. at 400; *see also, e.g.*, *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (no property fraud where defendants "did not walk away with the lanes; nor did they take the lanes from the Government by converting them to a non-public use"); *Walters*, 997 F.3d at 1225-26 (drawing from Supreme Court case law under 18 U.S.C. § 371). Here, Sheppard did not "obtain" any federal government dollars. He received money from the banks—and only the banks. There was no "actual" or "potential transfer of" money from the government to Sheppard. *Walters*, 997 F.2d at 1224. And "only a scheme to obtain money or other property *from the victim* by fraud violates § 1341." *Id*. at 1227 (emphasis added).

The government's "loan guarantee" theory of property fraud fails for the same and additional reasons. The government suggests that the object of Sheppard's fraud were guarantees of loan money made by the federal government. [*See* D.E. 214 at 7]. But as the government admits, those guarantees were made *to the banks*. [*Id*. (government "provide[d] payment guarantees to lenders").[10] Sheppard did not "obtain" the government's guarantees, and thus could not have committed wire fraud with federal loan guarantees as the property interest.

There are other major flaws in the government's assertion that an SBA loan guarantee was the object of the fraud. To start, this theory was not alleged in the indictment. In addition, it was not argued to the jury, and this Court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury." *Chiarella v. United States*, 445 U.S. 222, 236 (1980); *see also, e.g.*, *McCormick v. United States*, 500 U.S. 257, 270 & n.8 (1991). And the guarantee made by the government to the lending banks was at most "an incidental byproduct of the scheme," *Kelly v.*

---

[10] *See also* [11/27/23 T. (Harris) 213:17-22] ("Q. And how would the lending be made whole if the borrower could simply not pay it back? A. Well, that's what SBA's in the marketplace to do, to provide the guarantee to the lender. So in all cases, the SBA endeavors to make the lender whole in the event that a borrower doesn't repay a loan.")

11

*United States*, 140 S. Ct. 1565, 1573 (2020), not the *object* of the alleged fraud, which were PPP loan proceeds. *See id*. at 1573-74 (holding that a fraud conviction cannot be sustained where harm to property is only an "incidental (even if foreseen) byproduct" of the fraud, not "[t]he object of the scheme").

The government relies heavily on *United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023), but *Griffin* offers the government no support. In *Griffin*, the defendants were agents for the *lenders*. *Id*. at 734-35 (defendants worked at or with a company that "represent[ed] the lender before the SBA"). The object of their scheme was to "obtain" directly from the government "SBA guarantees for loans that did not meet the SBA's guidelines and requirements." *Id*. at 734. But none of that is true here. Sheppard did not work for the banks, like the defendants in *Griffin*. And the object of his alleged scheme was not to obtain loan guarantees from the SBA. *Griffin*'s holding about the relationship between a lender's agents and the SBA says nothing about the relationship between a *borrower* and the SBA.[11]

The Banks. Sheppard's conviction cannot be upheld on a banks-as-victim theory because Sheppard's scheme could not have caused the banks harm: They got exactly what they "bargained for." *Takhalov*, 827 F.3d at 1312-13. The banks made a loan, guaranteed by the government, on which they had no financial exposure. [*See* 11.27.23 AM Trial Tr. 214:2-13]. And Sheppard's alleged misrepresentations about PPP eligibility were not material to the banks' financial risk in extending the loans because the eligibility criteria were dictated solely by the government's policy interests. [D.E. 205 at 2, 16-18]. The government likewise produced no evidence that Sheppard intended to harm the banks by failing to repay the loans or otherwise "deprive" them of their property. *See United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (defendant did not possess a "purpose … to injure" drug distributors when she paid full price for their drugs). Any "unflattering motives" Sheppard may have possessed in applying for the loans did not include an intent to "unfairly depriv[e] the [banks] of their property." *Id*.

---

[11] The government is also wrong about convergence. The government was required to prove Sheppard's intent "to obtain money or property from the one who is deceived." *United States v. Bailey*, 123 F.3d 1381, 1390 n.12 (11th Cir. 1997) (quotations omitted). The government offered no evidence that Sheppard intended to deceive the government for the purpose of obtaining *its* property. Its evidence shows only that Sheppard knew the government was involved in some general sense in the PPP program, [*see* D.E. 214 at 8 n.2], not that Sheppard knowingly intended to deceive the government to obtain its property.

The government does not dispute that the banks got exactly what they bargained for. Instead, it suggests that they were "harmed" because they lost the time value of money on the funds they disbursed to Sheppard, who is paying back the loans at a 1% interest rate. [D.E. 214 at 9]. This new argument fails. First, there was no evidence of this alleged loss, and it was never argued to the jury that the interest rate caused the banks harm. Second, if the banks lost money by deploying assets in the PPP program versus other lending opportunities, that is because of the bank's investment strategy, not because of the Sheppard's alleged fraud. At the government's insistence, the defense was prohibited from inquiring into the banks' investment strategy. This is one of the reasons there was no evidence why the bank chose to participate in the PPP program, and whether they would have done better in private lending. Yet now the government seeks to preserve the wire fraud convictions on these non-record grounds. The suggestion is that the government would have earned more than 1% had it not loaned the funds to Sheppard's businesses but it offered no evidence on that score. It offered no evidence that the banks could have earned more had they retained possession of the loan money or that Sheppard's businesses would have taken out loans at higher rates had the banks known that they were not eligible to participate in PPP. Just the opposite: The only evidence on this question was that the banks sought out PPP loans and *benefitted* financially because they earned processing fees. [12/28/23 AM (Harris) 83:9-11].[12]

**B.     The Evidence Of Fraud Was Otherwise Insufficient**

The defense discussed several ways the evidence of wire fraud was insufficient in the motion. [D.E. 205]. The government makes blanket statements in opposition without meaningfully addressing these arguments. [D.E. 214 at 9-10]. Here, the government asserts, "the evidence was substantial" that Sheppard was responsible for the conduct giving rise to the wire fraud counts.

---

[12] The government also suggests that it need not prove harm because the wire fraud punishes the scheme to defraud. [D.E. 214 at 9]. But it does not follow that in prohibiting a scheme to defraud, Congress criminalized a scheme that would not amount to fraud because it caused no injury—in creating an inchoate crime, Congress did not fundamentally alter fraud's elements. And as the Eleventh Circuit has explained, "to defraud, one must intend to use deception to cause some injury." *Takhalov*, 827 F.3d at 1312. Here, there is no evidence that Sheppard intended to—or did—cause the banks injury because they stood only to gain from making PPP loans, even where non-pecuniary eligibility criteria were not satisfied. *United States v. Mansouri*, 2023 8430239 (W.D.N.Y. Dec. 5, 2023), decided on an indictment, did not squarely confront whether a wire fraud conviction can be sustained where the evidence shows that the supposed victim benefited from the alleged fraud. The argument there was that the banks were not harmed because the loans were guaranteed by the SBA. *Id*. at *2.

But the "substantial evidence" the government goes on to discuss is far from sufficient to sustain a conviction.

First, the government claims Sheppard was the sole signer on accounts used by the companies, and he controlled the funds in those accounts. But that does not mean Sheppard submitted fraudulent applications or documents for PPP. The evidence was that the bank account information necessary for the PPP applications was known and used by numerous workers, including Jeff Vasilas and Jeanette Gonzalez, among others. [*See*, e.g., 12/19/23 PM (E. Sheppard) 22:5-13]. The evidence also showed that Sheppard was not always in control of the funds in his accounts, as he tasked Ms. Gonzalez with that responsibility, Mr. Vasilas kept and used Sheppard's American Express card in Orlando, and Sheppard had employees in the past who stole from the company without his knowledge. [*See*, e.g., 12/19/23 AM (E. Sheppard) at 55:3-57:1]. Second, the government claims Sheppard's contact information was all over the PPP application. Again, that does not mean Sheppard is responsible for the fraudulent transmissions. The evidence was Sheppard's contact information was widely known to other workers in the company, including those who were assisting Sheppard with PPP applications. For example, copies of Sheppard's driver's license were available for use by workers. [*See*, e.g., 01/19/24 PM (E. Sheppard) at 41]. Third, the government claims that Sheppard's email and home IP address were used for the PPP loan applications. The evidence was that Sheppard's home was the office for many workers after COVID. [*See*, e.g., 12/06/23 AM (Del Pilar Ataca) at 36]. And many people had access to Sheppard's email addresses, including Mr. Vasilas and Ms. Gonzalez. [*See*, *e.g.*, 01/08/24 AM (E. Sheppard) at 39:12-20].[13]

The jury agreed the above evidence was not substantial. The jury acquitted Sheppard of several wire fraud accounts for applications submitted from Sheppard's home, using Sheppard's email, and containing Sheppard's contact information and bank information. Indeed, Sheppard was acquitted of most of the charges against him. He was found guilty of only 6 out of 14 charges.

---

[13] The government understates the importance of the gate proposal signed by Mr. Vasilas for Sheppard's home. [D.E. 214 at n.3]. The gate proposal was DocuSigned by Vasilas from the office at Sheppard's home, as evidenced by the IP address. This proves Vasilas used the office, signed documents from the office using the internet there, and had access to the office and internet while Sheppard was not present.

Barely two hours into deliberations, the jury informed the Court that it was deadlocked on most of the counts.[14]

The government ignores the defense's other arguments on the insufficiency of the evidence.

## CONCLUSION

For the foregoing reasons, Defendant Eric Dean Sheppard respectfully requests that the Court enter judgment of acquittal on all counts of conviction.

Dated: March 11, 2024.                                    Respectfully submitted,

| | |
|---|---|
| **NELSON MULLINS** | **BLACK SREBNICK** |
| One Biscayne Tower, 21st Floor | 201 South Biscayne Boulevard, Suite 1300 |
| 2 S. Biscayne Boulevard | Miami, Florida 33131 |
| Miami, FL 33131 | Tel. (305) 371-6421 |
| Telephone: 305.373.9400 | |
| | By: /s/ Howard Srebnick |
| By: /s/ Christopher Cavallo | HOWARD SREBNICK |
| Christopher Cavallo | Florida Bar No. 919063 |
| Florida Bar No. 0092305 | |
| Jayne C. Weintraub | |
| Florida Bar No. 320382 | |
| Jonathan Etra | |
| Florida Bar No. 686905 | |
| | |
| **O'MELVENY & MYERS** | |
| Jeffrey L. Fisher (admitted pro hac vice) | |
| 2765 Sand Hill Road | |
| Menlo Park, CA 94025 | |
| (650) 473-2600 | |
| | |
| Jason Zarrow (*pro hac vice forthcoming) | |
| 400 S. Hope Street | |
| Los Angeles, CA 90071 | |
| (213) 430-8367 | |

---

[14] The government also makes a strawman argument to get around its failure to sustain its burden of proof that the workers were truly independent contractors and not bona fide employees. As pointed out in the opening brief, and ignored by the government, the Government's IRS expert witness testified to the difficulty in properly classifying workers one way or the other and was never asked to opine that the workers were independent contractors. On this record, the classification made by the applicant does not provide the jury with evidence beyond a reasonable doubt on their proper status. The government also did not prove Sheppard's intent to defraud on this issue or with respect to the allegedly false business code or ineligible industry.

15

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 11, 2024, the foregoing document was filed via the Court's CM/ECF system to all counsel of record.

By: /s/ Christopher Cavallo
Christopher Cavallo