**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-cr-20290-BLOOM**

UNITED STATES OF AMERICA,

Plaintiff,

v.

ERIC DEAN SHEPPARD,

Defendant(s).
_______________________________/

**OMNIBUS ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL AND MOTION FOR ACQUITTAL**

**THIS CAUSE** is before the Court upon three separate motions: (1) Defendant Eric Dean Sheppard's ("Defendant") Motion for Judgment of Acquittal, ECF No. [205], filed on February 2, 2024; the Government filed a Response in Opposition, ECF No. [214], to which Defendant filed a Reply, ECF No. [218]; and (2) Defendant's Motion to Dismiss for Prosecutorial Misconduct or for a New Trial ("Motion to Dismiss"), ECF No. [204]; the Government filed a Response in Opposition, ECF No. [215], to which Defendant filed a Reply, ECF No. [219]; and (3) Defendant's Provisional Motion for Release Pending Appeal or, in the Alternative, for Self-Surrender, ECF No. [240]; the Government filed a Response in Opposition, ECF No. [245], to which Defendant filed a Reply, ECF No. [249]. The Court has reviewed the motions, the record in this case, the applicable law, and is otherwise duly advised. For the reasons that follow, Defendant's Motion for Judgment of Acquittal is granted in part and denied in part, ECF No. [205], Defendant's Motion for New Trial is denied, ECF No. [204], and Defendant's Provisional Motion for Release Pending Appeal or, in the Alternative, for Self Surrender, ECF No. [240], is granted in part and denied in part.

## I. BACKGROUND

On August 23, 2023, the Government filed a Superseding Indictment charging Defendant with nine counts of Wire Fraud (18 U.S.C. § 1343) and five counts of Aggravated Identity Theft (18 U.S.C. § 1028A). ECF No. [60]. In the Superseding Indictment, the Government alleges that Defendant engaged in a scheme and artifice to defraud the Small Business Administration (SBA), which administers the Paycheck Protection Program (PPP) and the Economic Injury Disaster Loan (EIDL) Program, as well as lenders administering the PPP loan program. *See id.* at 5. Defendant allegedly submitted false and fraudulent Payment Protection Program ("PPP") and EIDL — loans issued by the SBA under a program — loan applications on behalf of three entities, HM-UP Development Alafaya Trails, LLC ("Alafaya Trails"), HM Management and Development, LLC ("HMMD"), and HM Four, LLC, and forged signatures of other persons for certain documents submitted in support of the loan applications. ECF No. [84] at 1; *see also* ECF No. [60] at 1-3 (describing the PPP and EIDL programs).

Defendant proceeded to a jury trial on all fourteen counts, ECF No. [189]. On January 16, 2024, the Jury returned a verdict of guilty on six counts of the Superseding Indictment (Counts 5, 7, 8, 9, 13, and 14): four counts of Wire Fraud (Counts 5, 7, 8, 9) and two counts of Aggravated Identity Theft (Counts 13 and 14). The Jury returned a verdict of not guilty on eight counts (Counts 1, 2, 3, 4, 6, 10, 11, and 12).

Following the jury's verdict, Defendant filed a Motion for Judgment of Acquittal and a Motion for a New Trial. At issue are the guilty verdicts on Counts 5, 7, 8 and 9 for Wire Fraud; and Counts 13 (tied to the predicate offense of wire fraud in Count 8) and 14 (tied to the predicate offense of wire fraud in Count 9) for Aggravated Identity Theft. The conduct underlying the counts is as follows:

- Count 5: For the February 11, 2021 incident involving the electronic submission of

false and fraudulent IRS Form 941s (Employer's Quarterly Tax Return) in support of Alafaya Trails' PPP second draw loan application, from the Southern District of Florida to Bank Processor 1. ECF No. [189] at 7.

- Count 7: For the March 11, 2021 incident involving the electronic submission of a false and fraudulent PPP second draw loan application on behalf of Alafaya Trails, from the Southern District of Florida to Bank Processor 2, resulting in a PPP loan of approximately $148,397. ECF No. [189] at 7.
- Count 8: For the March 11, 2021 incident involving the electronic submission of false and fraudulent IRS Form 1065 (U.S. Return of Partnership Income) in support of Alafaya Trails' PPP second draw loan application, from the Southern District of Florida to Bank Processor 2. ECF No. [189] at 7.
- Count 9: For the March 12, 2021 incident involving the electronic submission of a false and fraudulent PPP loan application, IRS Form 1065 (U.S. Return of Partnership Income), and IRS Form 1067 (U.S. Return of Partnership Income), and IRS Form 940 (Employer's Annual Federal Unemployment Tax Return) on behalf of HMDD, from the Southern District of Florida to Bank 3, resulting in a PPP loan of approximately $148,591. ECF No. [189] at 7.
- Count 13: For the March 11, 2021 incident involving the use of a falsified IRS Form 1065 tax return electronically submitted to Bank Processor 2 in support of Alafaya Trails' PPP second draw loan application, using the name, EIN and PTIN of N.C. ECF No. [189] at 8.
- Count 14: For the March 12, 2021 incident involving the use of a falsified IRS Form 1065 tax return electronically submitted to Bank 3 in support of HMDD's PPP loan application, using the name, EIN and PTIN of N.C. ECF No. [189] at 8.

## II. LEGAL STANDARD

### A. Motion for Judgment of Acquittal

Under Rule 29(c) of the Federal Rules of Criminal Procedure, a Defendant may move for a judgment of acquittal after a Jury Verdict or Discharge.

> (1) Time for a Motion. A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.
> (2) Ruling on the Motion. If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.
> (3) No Prior Motion Required. A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

Fed. R. Crim. P. 29(c).

When deciding a motion under Rule 29, the district court must determine "whether the evidence, examined in the light most favorable to the Government, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt." *United States v. Williams*, 390 F.3d 1319, 1323-24 (11th Cir. 2004) (citing *United States v. Varkonyi*, 611 F.2d 84, 85-86 (5th Cir. 1980)). Thus, the test is whether a reasonable jury could find, beyond a reasonable doubt, that the defendant is guilty of violating the statutes alleged in the indictment. *United States v. Macko*, 994 F.2d 1526, 1532 (11th Cir. 1993). Applying this test, "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 390 F.3d at 1323 (citing *United States v. Gianni*, 678 F.2d 956, 958-59 (11th Cir. 1982) and *United States v. Burns*, 597 F.2d 939, 941 (5th Cir. 1979)). Because a jury may choose among reasonable constructions of the evidence, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 1323-24 (quoting *United States v. Young*, 906 F.2d 615, 618 (11th Cir. 1990); *United States v. Vera*, 701 F.2d 1349, 1357

(11th Cir. 1983)). "A conviction must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012) (citation omitted).

**B. Motion for New Trial**

Federal Rule of Criminal Procedure 33(a) states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "'When considering a motion for a new trial, the district court may weigh the evidence and consider the credibility of the witnesses.'" *United States v. Brown*, 934 F.3d 1278, 1297 (11th Cir. 2019) (quoting *United States v. Albury*, 782 F.3d 1285, 1295 (11th Cir. 2015)). "A motion for a new trial based on the weight of the evidence is 'not favored' and is reserved for 'really exceptional cases." *Id.* at 1297 (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985)). "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Martinez,* 763 F.2d at 1312-13. "[T]o warrant a new trial, the evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Witt*, 43 F.4th 1188, 1194 (11th Cir. 2022); *Brown*, 934 F.3d at 1297; *Martinez*, 763 F.2d 1313. The Eleventh Circuit has explained, that "'[i]n evaluating whether specific trial errors warrant a new trial, we apply the harmless-error standard.'" *United States v. Jefferson*, 824 F. App'x 634 (11th Cir. 2020) (quoting *United States v. Jeri*, 869 F.3d 1247, 1259) (11th Cir. 2017) (a civil case)); *see* Fed. R. Crim. P. 52(a) (defining harmless error standard as requiring that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

A district court may grant a new jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). For instance, a party may assert that "the verdict is against the weight of the evidence, that the damages are

excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Thus, a motion for new trial should be granted "when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Brown v. Sheriff of Orange Cnty., Fla.*, 604 F. App'x 915 (11th Cir. 2015) (per curiam) (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)). Additionally, the motion "may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Id.* "[G]ranting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her] ...." *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 237 F. App'x. 423, 424 (11th Cir. 2007) (quoting *Christopher v. Florida*, 449 F.3d 1360, 1366 n. 4 (11th Cir. 2006)). Ultimately, "motions for a new trial are committed to the discretion of the trial court." *Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999).

## III. DISCUSSION

### A. Motion for Judgment of Acquittal

#### i. Counts of Aggravated Identity Theft

The Jury found Defendant guilty of Aggravated Identity Theft on two Counts:

- Count 13 of the Superseding Indictment, for using the Name, Employer Identification Number ("EIN"), and Preparer Tax Identification Number ("PTIN") of Certified Public Accountant Neal Cupersmith ("Cupersmith") on a falsified IRS form 1065 tax return submitted in support of Alafaya Trails' PPP second draw loan application for a loan funded by Northeast Bank on March 11, 2021. ECF No. [60]; Government Exhibit 20-11. The Aggravated Identity Theft conviction relates to the underlying Wire Fraud in Count 8.

- Count 14 of the Superseding Indictment, for using the Name, EIN, and PTIN of Cupersmith on a falsified IRS form 1065 tax return submitted to Cross River Bank in support of HMDD's PPP loan application on March 12, 2021. ECF No. [60]; Government Exhibit 22-3. The Aggravated Identity Theft conviction relates to the underlying Wire Fraud in Count 9.

Examining the evidence "in the light most favorable to the Government," as the Court must, *Williams*, 390 F.3d at1323- 24, the facts underlying these Counts are as follows. Defendant applied for PPP loans for two of his companies, Alafaya Trails and HMMD in March 2021. PPP loans were SBA-backed loans that helped businesses keep their workforce employed during the COVID-19 crisis. Accordingly, the employers' payroll expenses were used to calculate the amount of money the applicant businesses were eligible to receive under the PPP. ECF No. [60] ¶ 3. In the PPP loan application, businesses, through authorized representatives, had to state their: (a) average monthly payroll expenses, and (b) number of employees. *Id.*

When Defendant applied for both the PPP loan from Northeast Bank and from Cross River Bank, Defendant sent the requested income tax return form 1065 for Alafaya Trails and HMMD, respectively. The tax returns forms were false, and contained false payroll figures, revenues, and business type. Government Exhibit 20-11; Government Exhibit 22-3. The forms were signed by Cupersmith — Defendant's companies' usual accountant and tax preparer — and stated Cupersmith's firm name, address, phone number, EIN, and PTIN in the tax preparer box. In fact, Cupersmith's signature had been forged, and the tax return was prepared by Defendant, not Cupersmith.

Defendant argues that a judgment of acquittal is required on both counts of Aggravated Identity Theft under *Dubin v. United States*, because the crux of his conviction for wire fraud was not a misrepresentation about the identity of Cupersmith. 599 U.S. 110, 114 (2023). ECF No. [205]

at 4-5. The crux of Defendant's fraud was that he misrepresented the characteristics of his businesses and their eligibility for participation in PPP, not Cupersmith's identity. *Id.* Finally, Defendant's use of Cupersmith's identity was not a but-for cause of the fraud, which is required for it to be at the crux of the fraud under *Dubin*. *Id.* at 5. Moreover, Defendant argues that, unlike in *Dubin*, Cupersmith's name did not even play a causal role in the approval of his PPP loan application as banks did not rely on the form on which Cupersmith's name appeared to approve the loans. *Id.* at 7-8. Because the misidentification is not a cause of the fraud, it cannot be at the crux of the Wire Fraud. ECF No. [205] at 8.

The Government responds that the elements of Aggravated Identity Theft are met and thus Defendant's convictions under Counts 13 and 14 satisfy *Dubin*. ECF No. [214] at 21-27. Under both Counts 13 and 14, there was fraud or deceit "about identity" as Defendant stole Cupersmith's identity to misrepresent that he had prepared the Defendant's tax returns, which was akin to defendant Linton's use of the doctor's identity to claim he authorized prescriptions in *United States v. Gladden*, 78 F.4th 1232, 1245 (11th Cir. 2023). The Government asserts Defendant's misuse of identity was at the crux of what made Defendant's conduct criminal and sustains a conviction of Aggravated Identity Theft under *Dubin*. ECF No. [214] at 22-27. Moreover, contrary to Defendant's assertion, the banks did review and rely on the 2020 income tax return. *Id.* at 25.

Defendant replies that under *Dubin* (1) lending credibility to fraud cannot be at its crux, but is merely ancillary to the fraud, and (2) because Cupersmith's name played no causal role in the fraud, it cannot be at the crux of it. ECF No. [218] at 1, 5. First, Defendant's misrepresentations about his accountant's identity are not what made the underlying conduct fraudulent. ECF No. [218] at 1. Here, the crux of the Wire Fraud were misrepresentations about W-2 employees and the industry in which Sheppard's businesses operated, not Cupersmith's identity. *Id.* at 4. Second, Defendant argues that there is no evidence that the tax forms containing Cupersmith's identity

were actually relied on by the banks, so that there is no causal relationship between the identity theft and the underlying offense as required under *Dubin*.[1] ECF No. [218] at 5-9.

**a. The Supreme Court's Analysis in *Dubin***

Titled "Aggravated Identity Theft[,]" 18 U.S.C. § 1028A states as follows:

> Whoever, during and *in relation to* any felony violation enumerated in subsection (c), knowingly transfers, possesses, or *uses*, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added).

In *Dubin*, the Supreme Court rejected a sweeping reading of the statute that encompassed"defendants who fraudulently inflate the price of a service or good they actually provided" if the "billing or payment method employs another person's name or other identifying information[.]" *Dubin*, 599 U.S. at 114. To do so, *Dubin* went through a methodical analysis of the text of 18 U.S.C. § 1028A(a)(1): the Supreme Court explained what the term "uses" and "in

---

[1] As to Count 13, Defendant explains that the Government's only evidence of reliance on form 1065 is based on a guidance tool of Northeast Bank, which indicates that Northeast Bank looks at forms 1065 when reviewing PPP loan applications. Government Exhibit 20-3; ECF No. [218] at 5-6. That tool is irrelevant because the bank only requested a form 1065 for a partnership, but treated Alafaya Trails as a corporation and did not request a Form 1065 for such corporations. ECF No. [218] at 6. Moreover, there is no support for the proposition that Northeast Bank relied on the 1065, as its Senior Vice President, Toye, explained at trial that it instead relied on Defendant's form 940 to substantiate average monthly payroll and determine Defendant's eligibility to participate in the PPP program. ECF No. [218] at 6. Toye's testimony also established that the 1065 form was not needed to substantiate revenue decline. ECF No. [218] at 7, [205-3].

As to Count 14, Defendant argues the testimony of Associate Program Manager Spencer Lord at Cross River Bank establishes that the Cross River underwriter did not read the 1065 form which contained Cupersmith's identifying information. ECF No. [218] at 7-8. Instead, there was evidence that the bank relied on the 940 form. ECF No. [218] at 8. Though Cross River did initiate a process of verifying the tax return by providing to Defendant an IRS form 4506-6-T to execute at closing, the loan was approved before Cross River could use the form and the Government (?) had no evidence of what Cross River relied on in approving the loan. ECF No. [218] at 8-9. If Cross River had reviewed the form 1065, they would have seen that its NAICS (North American Industry Classification System) business code did not match the code on the PPP application, Government Exhibit 22-3 at 1, 22-6, and did not exist in the NAICS business clarification list. *Id.*

relation to" meant in the context of the statute, and how the statute's title illuminated the core of conduct the statute meant to encapsulate.

First, the Supreme Court interpreted the meaning of the word "uses" in the statute: it held that for someone to "knowingly … *use*[], without lawful authority, a means of identification of another person[,]" there must be deception going to "who" is involved rather than just "how" or "when" services were provided. *see* § 1028A(a)(1); *Dubin*, 599 U.S. at 123. The Supreme Court explains this is required because "identity theft is committed when a defendant *uses* the *means of identification itself* to defraud or deceive." *Id.* (emphasis added). [2]

When read in the context of the statute, the word "use" merely requires that the defendant actually committed identity theft: as detailed by the Court,

> This understanding of identity theft also supports a more targeted definition of "uses." The word "use" appears in these definitions with a specific meaning: Identity theft encompasses when a defendant "uses the information to deceive others," Black's 894 (emphasis added), and "the fraudulent ... use" of a means of identification, Webster's xi (emphasis added). In other words, identity theft is committed when a defendant uses the *means of identification itself* to defraud or deceive. This tracks the Sixth Circuit's heuristic. When a means of identification is used deceptively, this deception *goes to "who" is involved, rather than just "how" or "when" services were provided*. Use of the means of identification would therefore be at "the locus of [the criminal] undertaking," rather than merely "passive," "passing," or ancillary employment in a crime. *Jones*, 529 U.S. at 855–856, 120 S.Ct. 1904.

*Id.* at 123 (emphasis added).

Second, the Supreme Court clarified the meaning of "in relation to" in § 1028A, which

---

[2] Use, the third of three verbs listed in the statute ("transfers, possesses, or uses"), means something like this:

> There is the defendant [who] has gone through someone else's trash to find discarded credit card and bank statements and thus has taken possession unlawfully. There is the bank employee who passes along customer information to an accomplice, and thus transfers it unlawfully. Then there is use involving fraud or deceit about identity: a defendant [who] has used another person's identification information to get access to that person's bank account.

*Dubin*, 599 U.S. at 126-27 (citation and internal quotation marks omitted) (alterations in original).

meant whether the "use of the means of identification is at the crux of the underlying criminality." *Id.* at 122. When read in the context of the statute, "in relation to" clarifies that the use of the means of identification must occur "during and in relation to any felony violation enumerated in subsection (c)." In other words, the means of identification has to play a "central role" or be a "key mover" in the predicate offense:

> This supports a reading of "in relation to" where use of the means of identification is at the crux of the underlying criminality. These definitions refer to offenses built around *what the defendant does with the means of identification in particular.* In other words, the means of identification specifically is a *key mover* in the criminality. This *central role* played by the means of identification, which serves to designate a specific person's identity, explains why we say that the "identity" itself has been stolen. *See, e.g., Spears*, 729 F.3d at 756 ("identity theft" occurs when someone's "identity has been stolen or misappropriated"). This helps explain why the examples resulting from the Government's theory do not sound like identity theft. If a lawyer rounds up her hours from 2.9 to 3 and bills her client using his name, the name itself is not specifically a source of fraud; it only plays an ancillary role in the billing process. The same is true for the waiter who substitutes one cut of meat for another; we might say the filet mignon's identity was stolen, perhaps, but not the diner's.

*Id.* at 122–23 (emphasis added).

In its analysis, the Supreme Court then reiterated its definition of both "uses" and "in relation to".

> Taken together, from text to context, from content to common sense, § 1028A(a)(1) is not amenable to the Government's attempt to push the statutory envelope. A defendant "uses" another person's means of identification "in relation to" a predicate offense when this use is at the crux of what makes the conduct criminal. To be clear, being at the crux of the criminality requires more than a causal relationship, such as " 'facilitation' " of the offense or being a but-for cause of its "success." *Post*, at 1575, 1576 – 1577 (GORSUCH, J., concurring in judgment). Instead, with fraud or deceit crimes like the one in this case, the means of identification specifically must be used in a manner that is fraudulent or deceptive. Such fraud or deceit going to identity can often be succinctly summarized as going to "who" is involved.

*Id.* at 131–32. The Court set forth the "at the crux" requirement (what the defendant does with the means of identification in relation to the predicate offense, here wire fraud): "the means

of identification specifically must be used in a manner that is fraudulent or deceptive." *Id.* It also sets forth the "identity theft" requirement: "Such fraud or deceit going to identity can often be succinctly summarized as going to 'who' is involved." *Id.*

**b. Parties' Differing Interpretations of *Dubin***

Facing this Court are differing interpretations of the Aggravated Identity Theft statute, 18 U.S.C. § 1028A, and Supreme Court and Eleventh Circuit case law interpreting it. *See Dubin v. United States*, 599 U.S. 110, 114 (2023); *United States v. Gladden*, 78 F.4th 1232, 1245 (11th Cir. 2023); *Carter v. United States*, No. 22-12744, 2024 WL 20847, at *9 (11th Cir. Jan. 2, 2024).

The Government argues that because Defendant used Cupersmith's means of identification fraudulently, the conduct falls within the scope of § 1028A and is "at the crux" of the predicate offense i.e. the wire fraud here. ECF No. [214] at 24-26. The Government's argument reads *Dubin* as only setting forth one requirement: that Defendant stole another's identity and used it in a deceptive manner for it to be "at the crux" of the underlying offense. *Id.* at 27. An out-of-circuit decision in a PPP fraud case in the Western District Court in Texas best supports the Government's reading here. *See United States v. Fullerton*, 2023 WL 6150782 (W.D. Tx. Sept. 20, 2023).

Defendant argues that § 1028A and *Dubin* require more than the means of identification being used in the predicate offense i.e. more than just identity theft. *See generally* ECF Nos. [205], [218]. *Dubin* also requires that the means of identification be "at the crux" of what makes Defendant's conduct criminal, which in turn requires more than fraudulent use of the means of identification by Defendant. As *Dubin* observes, it requires more than "but-for" causation or facilitation of the offense. ECF No. [218] at 2-5 (quoting *Dubin*, 599 U.S. at 131). Instead, it requires that the means of identification be a "key mover" or play a "central role" in the underlying offense. *Id.* (quoting *Dubin*, 599 U.S. at 123). An in-circuit district court decision best supports

Defendant's reading. *United States v. Noble*, No. CV 1:23-CR-00165-SDG, 2024 WL 253623, at *2 (N.D. Ga. Jan. 23, 2024).

**c. The Statute and Post-*Dubin* Eleventh Circuit Precedent**

After an analysis of § 1028A, *Dubin*, *Gladden*, *Carter*, and the subsequent case law, this Court agrees with the *Noble* court and Defendant. *Dubin* and binding Eleventh Circuit precedent require more than fraudulent use of a means of identification for the means of identification to be at the crux of the underlying offense. Here, Defendant's misuse of Cupersmith's means of identification was not "at the crux" of the Wire Fraud for Counts 13 and 14. Because Defendant's conviction does not fall within the scope of § 1028A, Defendant's conviction on both counts for Aggravated Identity Theft shouldmust? be vacated. Reading the *Dubin* opinion together with the text of the statute, the "identity theft" and the "at the crux" requirement *both* have to be satisfied for there to be an Aggravated Identity Theft conviction. *Dubin* sets forth two requirements for an Aggravated Identity Theft conviction: that (1) the "identity theft" requirement: the deception (the use of the means of identification of another) goes to "who" is involved, rather than just "how" or "when" services were provided, *Dubin,* 599 U.S. at 123 and (2) the "at the crux" requirement: that use of the means of identification is a "key mover" of — or plays a "central role" in — the predicate offense, *id.* at 122–23.

The elements under § 1028A confirm that reading: Aggravated Identity Theft under 18 U.S.C. § 1028A requires the Government to prove that (1) the defendant knowingly transferred, possessed, or *used* (i.e. committed identity theft) another person's means of identification; (2) without lawful authority; *and* (3) during and *in relation to* (i.e. the misidentification was "at the crux" of the predicate offense) the specified wire fraud counts alleged in the Superseding Indictment. *See, e.g,* Eleventh Cir. Pattern Jury Instr. O40.3 (Mar. 2023) (emphasis added). Both the use of the means of identification of another (identity theft) and that this use was in relation to

the predicate offense (at the crux) are required for an Aggravated Identity Theft conviction under § 1028A.

This reading is confirmed by Eleventh Circuit case law. The Eleventh Circuit's analysis in *Carter* bolsters this analysis as it asked first about whether Carter misrepresented "who received the services" (i.e. whether he committed identity theft) *and* whether his use of the means of identification "was 'at the crux of what made' the entire scheme fraudulent" in affirming a defendant's conviction for aggravated identity theft. *Carter*, No. 22-12744, 2024 WL 20847, at *9.

While the "identity theft" requirement is relatively straightforward, a close reading of *Dubin* and Eleventh Circuit case law serves to further elucidate the "at the crux" requirement.[3] The Eleventh Circuit clarified that "Section 1028A's reach is [] limited to situations where 'a genuine nexus' exists between the use of a means of identification and the predicate offense." *Gladden*, 78 F.4th at 1244. Section 1028A and *Dubin* make clear that at least three types of causation are insufficient to sustain a finding that the means of identification is "at the crux" of an offense. The plain text of the statute states as follows:

> **(a) Offenses.--(1) In general.**--Whoever, during and *in relation to* any felony

---

[3] As spelled out by Justice Gorsuch in a concurrence in *Dubin*, the Supreme Court left unanswered of what level of causation is required for a means of identification to be "at the crux" of an offense:

> When, exactly, is a "means of identification" "at the crux," "a key mover," or a "central role" player in an offense? No doubt, the answer "turns on causation, or at least causation often helps to answer the question." *United States v. Michael*, 882 F.3d 624, 628 (C.A.6 2018). The Court agrees but stresses that "a causal relationship" of any kind will not suffice. *Ante*, at 1573. At the same time, however, it studiously avoids indicating whether the appropriate standard is proximate cause or something else entirely novel. *Ibid.* All of which gives rise to further questions. In virtually every fraud, a "means of identification" plays some critical role in the fraud's success—good luck committing a mail or wire fraud, for instance, without relying heavily on the name of the victim and likely the names of other third parties. Just how much "causation" must a prosecutor establish to sustain a § 1028A(a)(1) conviction? For that matter, how does one even determine the extent to which a "means of identification" "caused" an offense, as compared to the many other necessary inputs?

*Id.* at 134–35 (Gorsuch, J., concurring). Eleventh Circuit case law provides further clarification.

> violation enumerated in subsection (c), knowingly transfers, possesses, or *uses*, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added).

The statute's use of "during *and* in relation to" indicates that it cannot simply be that the misidentification occurred *during* the fraud, it must also be "in relation to" it (emphasis added). If "in relation to" merely required the use of the means of identification "during" the fraud, then the term "in relation to" would be superfluous. That cannot be. It is "a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S. Ct. 441, 449, 151 L. Ed. 2d 339 (2001) (citation and internal quotation marks omitted). Accordingly, "in relation to" requires more than just that the means of identification was used during the fraud. Further, the Supreme Court in *Dubin* made clear that "being at the crux of the criminality requires more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its success." 599 U.S. at 131-32. Accordingly, for the means of identification to be "at the crux" of the underlying criminality, i.e. used "in relation" to an underlying offense:

(1) a defendant must do more than "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person" *during* an enumerated felony, under the terms of 18 U.S.C. § 1028A(a)(1);

(2) the means of identification of another person must do more than facilitate the offense; and

(3) the means of identification of another person must be more than a but-for cause of the enumerated felony's success.

Some additional causation, some genuine nexus between the identity theft and the enumerated offense (here wire fraud) is therefore required.

The Eleventh Circuit cases construing *Dubin* clarify what additional level of causation is required. The difference in outcome between the two defendants's convictions in *Gladden* hinged on the "identity theft" requirement, yet the case still sheds light on what causation is necessary for the means of identification of another to be "at the crux" of the predicate offense. In *Gladden*, the Eleventh Circuit upheld the conviction for Aggravated Identity Theft of an employee, Linton, who represented to pharmacy benefit managers and insurance companies that the compounding pharmacy she worked for was filling prescriptions for patients, when the products were actually being sent to the compounding pharmacy's owner. *Gladden,* 78 F.4th at 1245. Defendant Linton was using the names of a doctor to represent to insurance companies that the doctor "had authorized the additional prescriptions when, in fact, he had not." *Id.* at 1245. In addition, she used the names of patients to refill prescriptions in patients' names "even though [patients] were neither aware of nor received any product[.]" *Id.* The Eleventh Circuit found that this "deception centered on the identity of the individual receiving the product[.]" *Id.* Unlike in *Dubin*, the employee "did not provide a service to a client while merely misrepresenting how the service was performed to inflate the bill." *Id.* at 1246. Moreover, the Eleventh Circuit explained that "[r]ather, Linton used the means of identification of former patients and prescribing doctors to overbill for certain products. Linton's conduct thus falls squarely within the classic variety of identity theft left untouched by *Dubin*." *Id.* at 1245-46 (11th Cir. 2023) (internal citations and quotation marks omitted). Accordingly, Linton's conduct fell within the purview of the Aggravated Identity Theft statute because she misrepresented to *who* the products went. *Id.* That such misidentification occurred satisfied the first *Dubin* requirement: that deception goes to "who" is involved, rather than just "how" or "when" services were provided, *Dubin*, 599 U.S. at 123.

In contrast, in the same case, the Eleventh Circuit vacated defendant Gladden's conviction after he filled a medically unnecessary prescription for a patient due to an erroneous jury instruction, which stated contrary to *Dubin* that "[t]he means of identification at least must facilitate, or have the potential of facilitating, the crime alleged in the indictment[.]" *Gladden*, 78 F.4th at 1248. Though the patient never needed the prescription for medical reasons, she did receive the prescription and it was prescribed by a doctor. As explained by the Court, "Gladden did not forge the name of the prescribing doctor on the prescription. Nor did he misrepresent who would be receiving the filled prescription. Rather, [one of Gladden's sales representatives] had her 'doctor buddy' write a prescription for her minor daughter, which she was lawfully entitled to do." *Id.* at 1249. As a result, the Eleventh Circuit found that Gladden did not "misrepresent *who* received the prescriptions." *Id.* at 1248 (emphasis added). The only misrepresentation that occurred was whether the prescription was medically necessary." *Id.* at 1249. Accordingly, the "identifying information was merely ancillary to the deception." *Id.* As the Eleventh Circuit further explained, "While Linton misrepresented *who* was receiving the prescriptions, Gladden's misrepresentation to the insurance companies and [pharmacy benefit managers] involved only whether the prescriptions were medically necessary." *Id*. at 1248–49 (emphasis added). The "identity theft" requirement was satisfied for Linton because she misidentified who received and authorized the prescriptions, but it was not satisfied for Gladden.

But such misidentification must also be "at the crux" of the underlying offense. Linton's conviction, the Eleventh Circuit instructs, was sustained since the "evidence at trial is more than sufficient to establish that she knew the means of identification of Donald and Doris Edenfield, Derrick Wester, and Dr. Almirol were 'used ... during and in relation to' the health care fraud conspiracy" *Id.* at 1246. Linton's use of the means of misidentification was "at the crux" of the underlying criminality because:

> Linton's forgery of the [patients'] identities is *at the heart of the deception*: Linton used the identities of the [patients] to continue refilling prescriptions in their names, even though they were neither aware of nor received any products. Because the deception centered on the identity of the individual receiving the product, Linton committed identity theft. *See Dubin*, 143 S.Ct. at 1568 ("This central role played by the means of identification, which serves to designate a specific person's identity, explains why we say that the 'identity' itself has been stolen."). The use of the fraudulent identities *was central to the scheme* at Global; Linton's fraudulent representation that individuals such as the Edenfields and Wester were the recipients of the prescriptions issued in their names *directly enabled* Global to continue billing for medically unnecessary prescriptions.

*Gladden*, 78 F.4th at 1245 (emphasis added).

In *Carter v. United States*, No. 22-12744, 2024 WL 20847, at *9, the Eleventh Circuit reiterated the "heart of the deception" language from *Gladden*, concluding that "Carter's forgery of the students' identities is thus 'at the heart of the deception' and his conduct 'falls squarely within the classic variety of identity theft left untouched by *Dubin*.'" *Id.* at *9. *Gladden* and *Carter* therefore further clarify what it takes for the means of identification to be "at the crux", a "key mover", or playing a "central role" in the predicate offense: the means of identification has to be at the "heart of the deception", "central to the scheme" or "directly enable[]" the predicate offense. *Gladden*, 78 F.4th at 1245.

Similarly interpreting *Dubin* and *Gladden* as setting forth two requirements, the Northern District of Georgia explained that when "the Court reads *Dubin* and *Gladden* in conjunction with one another, aggravated identity theft occurs when (1) a defendant misuses a means of identification and (2) the misuse is material to the predicate offense." *Noble*, No. CV 1:23-CR-00165-SDG, 2024 WL 253623, at *2. In the case, the *Noble* court found that the first requirement was met: the defendant did misuse the means of identification of another person. However, this misuse was not "at the crux" of (or material to, in the *Noble* court's words) the predicate offense .

Noble pled guilty to two counts of theft of government funds and one count of aggravated identity theft, after being indicted for purportedly submitting false and fraudulent EIDL

applications to the SBA during the COVID-19 pandemic. ECF No. [4], *United States v. Noble*, No. 23-cr-00165-SDG (N.D. Ga. May 18, 2023); ECF No. [1], *United States v. Mays, et al.*, No. 1:22-cr-343-SDG-JKL-2 (N.D. Ga. Sept. 9, 2022). Noble was accused of having a co-conspirator, Mays, submit a fraudulent EIDL application using the personal identification of a person, initials O.O. Noble and Mays had misrepresented to O.O. that they were applying for a business grant on O.O.'s behalf. *Noble*, No. 23-cr-00165-SDG, ECF No. [11] at 4-5. O.O. had kept $9,000 of the EIDL grant and given Mays $1,000. *Id.* Noble moved to withdraw his guilty plea of aggravated identity theft after *Dubin* was published. The Court found that the withdrawal of this guilty plea was warranted because the use of O.O.'s means of misidentification was not material to the fraud:

> Where Noble admitted he used another's means of identification—O.O.'s name, perhaps also her address and various identification numbers—his use of the means of identification was not material to the small-business-loan fraud. Whether the loan application was successful hinged not on O.O.'s identifying information but on her business records. And where Noble acted fraudulently and deceptively—by filing loan applications using "false gross revenues, costs of goods sold, number of employees"[13]—his actions did not involve identity because business records are not a means of identification specific to O.O. The information that Noble misrepresented went not to "who" O.O. was, but to the "what" and the "how": what her business consisted of, and how her business qualified for a loan.

*Noble*, 2024 WL 253623, at *4. Ultimately, the Court found Noble's case to be so similar to defendant Gladden's that it could lift Gladden's analysis almost word for word:

> Changing the names and replacing "medically" and "prescription" with "economically" and "loan" yields the following:
>
>> [Noble's] conviction for aggravated identity theft was based on the [loan] that [Mays] obtained for [O.O.] .... [T]he [loan] in question was not [economically] necessary .... The deception at the heart of [Mays] and [Noble's] conduct, then, was obtaining [economically] unnecessary [loans]. The use of [O.O.'s] identifying information was merely ancillary to the deception; indeed, at no point did [Mays] and [Noble] misrepresent who received the [loans].
>>
>> The conduct underlying [Noble's] identity theft conviction is thus distinct from Linton's. While Linton misrepresented who was receiving the prescriptions, [Noble's] misrepresentation ... involved only whether the [loans] were [economically] necessary.
>
> *Id.* at 1248–49. This Court therefore reaches the same conclusion: Noble's conduct

constituted fraud, but not aggravated identity theft. *Id.* at 1249.

*Noble*, No. CV 1:23-CR-00165-SDG, 2024 WL 253623, at *4. The court therefore vacated Noble's guilty plea for aggravated identity theft under *Dubin*.

**d. The Instant Case**

The Court analyzes whether Defendant's conviction falls within the scope of the Aggravated Identity Theft statute by asking: whether (1) under the identity theft requirement, the deception (the use of the means of identification of another) goes to "who" is involved, rather than just "how" or "when" services were provided, *Dubin*, 599 U.S. at 123, and whether (2) under the "at the crux" requirement, the use of the means of identification is "at the crux" of the predicate offense, *id.* at 122–23. For this second question, in the Eleventh Circuit and Supreme Court's interchanging formulations, this is akin to asking if there is a genuine nexus between the identity theft or the predicate offense, whether the identity theft is a key mover of or directly enabling the predicate offense, or at the heart of the deception. In a motion for acquittal, this Court must construe the evidence in favor of the Government, and "[a]ll credibility choices must be made in support of the jury's verdict." *Williams*, 390 F.3d at 1323.

Both parties agree that the first requirement is met: Defendant concedes that Defendant committed identity theft here by using Cupersmith's name, signature, firm information, EIN and PTIN in the tax form preparer box of the form 1065, thus satisfying the requirement that he used the means of identification of Cupersmith to misrepresent "who" is involved: Cupersmith was not involved in drafting the form 1065. The issue before this court is whether the second requirement is met: whether the means of identification — Cupersmith's signature and firm information used in the tax preparer box of a fraudulent form 1065 — is "at the crux" of the predicate offense (here two counts of wire fraud). The Court finds it is not.

In finding so, the Court recedes from its previous analysis in its prior Order on Defendant's

Motion for Acquittal, ECF No. [170]. The Court is convinced by cases construing the "at the crux" requirement issued in the aftermath of that Order, namely *Joseph v. United States*, 23-cv-22529, *12024 U.S. Dist. LEXIS 36494, *7-8 (S.D. Fl. Feb. 29, 2024); the in-circuit court's decision in *United States v. Noble*, No. CV 1:23-CR-00165-SDG, 2024 WL 253623, at *4 (N.D. Ga. Jan. 23, 2024), discussed above; the Fifth Circuit's decision interpreting *Gladden* in *United States v. Croft*, 87 F.4th 644, 648 (5th Cir. 2023), which the Supreme Court denied a writ of certiorari for on April 1, 2024, *cert. denied*, No. 23-6895, 2024 WL 1348964 (U.S. Apr. 1, 2024). Those cases demonstrate that § 1028A and *Dubin* require that the means of identification play a more central role in the predicate offense to be "at the crux" of it than it did in this case.[4]

Since this Court's previous Order, case law has further clarified what use of a means of identification is "at the crux" of the predicate offense. *See, e.g.*, *Noble*, No. CV 1:23-CR-00165-SDG, 2024 WL 253623, at *4. For instance, this Court found that a defendant's use of the means of identification of another was at the crux of the underlying offense when a defendant filed fraudulent tax returns in the *victims'* names. *Joseph*, 23-cv-22529, *12024 U.S. Dist. LEXIS 36494, *7-8. There, a co-defendant "prepared and electronically filed federal tax returns for

[4] In its prior Order on Defendant's Motion for Acquittal submitted at the close of the government's evidence, ECF No. [162], the Court ruled as follows:

> In this case, Sheppard's use of the means of identification of Neal Cupersmith, M.S., or H.B. would be "in relation to" or "at the crux" of the Wire Fraud if that identification were used in a scheme to defraud the lenders of loan proceeds. The evidence supports that he has done so. That is because, in the light most favorable to the Government and as set forth below, the tax filings, the Lease, and the Bank Letter were false and used to induce the Lenders to disburse loan proceeds, specifically by seeking to deceive them that Sheppard's companies were entitled either to PPP or EIDL funds. As such, Sheppard's use of those individuals' means of identification is at the crux of the Wire Fraud. It is irrelevant whether their use was necessary to the loan applications or whether the use of those means of identification did in fact cause the disbursement of loan proceeds. That is because neither the language of the Aggravated Identity Theft statute nor the reasoning in *Gladden* impose such requirements.

ECF No. [170] at 13. Due to the benefit of additional case law, the Court no longer stands by this reasoning.

individuals who did not give either [defendant] or [the co-defendant] permission or authority to possess their personal identifying [*2] information used on the returns, or to file the returns on their behalf." *Id.* at *1-2. There, this Court found that the defendant has misrepresented "who received the services" — satisfying the identity theft requirement. *Id.* at *7. This Court also found the names of the victims were at the heart of the deception, as Defendant "used [the victims' information] to file fraudulent tax returns *in their names*." *Id.* at *8 (emphasis added). The means of identification of another person therefore "directly enabled" the fraud under *Gladden*, 78 F.4th at 1245, and was a "key mover" in the underlying fraud. This is distinguishable from the case at issue here: here, Defendant did not use Cupersmith's means of identification to file Cupersmith's tax returns and recover Cupersmith's tax refund.

The Fifth Circuit also interpreted *Gladden*, in a decision in which the Supreme Court denied certiorari in April 2024. The Fifth Circuit upheld an aggravated identity theft conviction under § 1028A when the defendant created a school for K-9 instructors, Universal K-9, and represented that four instructors taught specific courses at the school when none actually did. There, the defendant used the identity of the four instructors to obtain certification from the Texas Veterans Commission ("TVC"). The certification would then enable defendant to offer courses to veterans who would pay tuition with G.I. Bill funds paid by the Department of Veteran Affairs. The Court made clear that "Universal K-9's application would not have been approved without the names of the instructors, their qualifications, and information about the classes they would teach." *Id.* at 646. The Fifth Circuit made clear that this remained within the scope of § 1028A under *Dubin* as "Croft's misrepresentations about 'who' was teaching courses at Universal K-9 were the basis—and 'heart of'—his wire fraud convictions." *Croft*, 87 F.4th at 648. Accordingly, the Court explained that "[a]t its core, Croft's application to the TVC was fraudulent *because of* his misappropriation of the victim trainers' means of identification. This theft was the 'key mover

in [his] criminality.'" *Id.* at 649 (emphasis added) (quoting *Dubin*, 599 U.S. at 122-123).

In contrast to those cases, there is much less of a nexus between Defendant's use of Cupersmith's means of identification — signature, EIN and PTIN — and the wire fraud underlying Counts 13 and 14. According to the Government's theory, Defendant used Cupersmith's – his company's accountant — signature, name, EIN and PTIN to "convey[] to the lenders that the figures reported on the tax returns were reliable" when in fact they were false. ECF No. [214] at 27. This is different than the defendants in *Croft* and *Joseph* who committed aggravated identity theft: in those cases, it was *only* because they were using the other person's means of identification – using other people's names to obtain certification of a school in *Croft* or filing another person's tax returns in *Joseph* – that they were entitled to the fraudulent benefit. There, the identity thefts did more than just "'facilitation' of the offense or being a but-for cause of its 'success.'" *Dubin*, 599 U.S. at 131–32. They "directly enabled" the predicate offense. *Gladden*, 78 F.4th at 1245. Accordingly, there was a "genuine nexus … between the use of a means of identification and the predicate offense." *Gladden*, 78 F.4th at 1244.

Here, there is no such genuine nexus. Defendant applied for loans for his own companies, and merely misrepresented that the forms were prepared by his usual tax preparer, when they were not. As the Government conceded at oral argument, ECF No. [227], the fraud could also have been successful had Defendant not appended Cupersmith's name, signature and information at the end of the form 1065 but merely used his own. Indeed, Defendant could have submitted the exact same tax return for his own companies Alafaya Trails and HMMD without falsely representing that they were prepared by his accountant Cupersmith, and the outcome of the fraud could have been the same. The "key mover" in his fraud was the false payroll and business information, not the identity of the tax preparer. Where Cupersmith's means of identification did not even cause the fraud, it cannot be "at the crux of the wire fraud" because "being at the crux of the criminality requires

more than a causal relationship, such as "'facilitation'" of the offense or being a but-for cause of its 'success.'" *Dubin*, 599 U.S. at 131–32.

Construing the evidence "in the light most favorable to the Government[,]" *Williams*, 390 F.3d at 1323-24, Defendant did use the means of identification of Cupersmith (1) during an enumerated felony; (2) the means of identification is a cause of the enumerated felony's success, as it lent credibility to the fraud, but not a but-for cause, and (3) the misuse of the means of identification of another facilitated the offense in some way. That is not enough for the means of identification to be "at the crux" of the predicate offense. Defendant's case is much more like *Noble*, where,

> [w]hether the loan application was successful hinged not on O.O.'s identifying information but on her business records. And where Noble acted fraudulently and deceptively—by filing loan applications using 'false gross revenues, costs of goods sold, number of employees'—his actions did not involve identity because business records are not a means of identification specific to O.O.

*Noble*, No. CV 1:23-CR-00165-SDG, 2024 WL 253623, at *4. Similarly here, whether Defendant's fraud was successful did not hinge on Cupersmith's identity, but on the false payroll information he appended to his loan application to obtain loan for his businesses that his businesses were not entitled to. The means of identification was not a "key mover" in the fraud under *Dubin*. It cannot "directly enable" the fraud or be "at the heart of the deception" as required by the Eleventh Circuit. This case is unlike *Croft* where "Croft's application to the TVC was fraudulent *because of* his misappropriation of the victim trainers' means of identification.'" *Croft*, 87 F.4th at 649 (emphasis added).

The Court ultimately agrees with Defendant that his use of Cupersmith's identity to falsely represent that his own accountant prepared the fraudulent tax forms was ancillary to the wire fraud, and not at its crux. But the Court does not ask whether the bank *actually* relied on the fraudulent means of identification, as the Defendant urges the Court to do. There is no such actual reliance

requirement in the current case law. Instead, the Court follows the Eleventh Circuit and Northern District of Georgia's approach of considering the relationship between the identity theft and the predicate offense, and asks whether the identity theft is "at the heart of the deception[,]" *Gladden*, 78 F.4th at 1245, or "material to the predicate offense." *Noble*, 2024 WL 253623, at *2.[5] It is not.

Defendant's use of the means of identification of Cupersmith — Cupersmith's signature, EIN and PTIN on the form 1065 when applying for PPP loans with Northeast Bank and Cross River Bank — was not at the crux of Defendant's wire fraud. Accordingly, the Court acquits Defendant of Count 13 and 14 for Aggravated Identity Theft.

**ii. Counts of Wire Fraud**

**i. Traditional Property Interest**

Next, the Court turns to the second argument in Defendant's Motion for Acquittal, ECF No. [205]. Defendant argues that there was no scheme to defraud here as his actions did not target a traditional property interest. ECF No. [205] at 13-1. Specifically, Defendant argues that Sheppard's wire fraud convictions cannot be sustained based on a harm to the Small Business

---

[5] The Government relies on an out-of-circuit district court decision for its position that Defendant's use of Cupersmith's means of identification is at the crux of both counts of wire fraud. *United States v. Fullerton*, 2023 WL 6150782 (W.D. Tx. Sept. 20, 2023). The defendant was charged with aggravated identity theft after "Defendant allegedly used the name and forged signature of a certified public accountant, S.S., to indicate that the form had been completed by a tax preparer, when in fact, S.S. did not prepare any of the forms for the PPP application" when submitting fraudulent form 940 and 941s in support of a PPP application. *Id.* at *1. There, "Defendant stole an accountant's identity and forged his signature for the purpose of signifying that the tax records were properly prepared." *Id.* at *4. After the defendant moved to dismiss this count of the indictment, the court held "[t]his action directly legitimized the loan applications and increased the likelihood that they would be approved by the appropriate financial institutions." *Id.* This was enough for the court to uphold the defendant's charge of aggravated identity theft under *Dubin*. Like the Government in its response brief, the court in this case stopped at the "identity theft" requirement – tied to the statutory term "uses" – of *Dubin* and discussed it as being identical to the "at the crux" requirement: the court held that "[h]is fraud thus centered on 'who' was involved in the fraudulent action. Because his use of S.S.'s identity was 'used in a manner that is fraudulent or deceptive,' *Dubin*, 143 S. Ct. at 1573, Count 10 properly states facts that would constitute a charge of aggravated identity theft under § 1028A." *Id.* at *4. *Dubin* requires more than the occurrence of identity theft during a predicate offense: the identity theft must be "at the crux" of the predicate offense. Accordingly, the Court declines to follow the reasoning of *Fullerton*.

Administration (SBA) because any harm that could have been suffered by the SBA was not to a "traditional property interest." *Id.* at 16-17. *Ciminelli v. United States*, 598 U.S. 306, 309 (2023). Instead, the SBA's harm, to the extent it could suffer one, is purely "regulatory," and regulatory interests are not protected by the wire fraud statute because that statute "protects property rights only." *Cleveland v. United States*, 531 U.S. 12, 19- 20 (2000); *see also Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020). ECF No. [205] at 16. Similarly, the banks did not suffer a harm to a traditional property interest because they received what they bargained for: they made a loan, guaranteed by the government, on which they had no financial exposure. ECF No. [205] at 17-18 (quoting *United States v. Kachkar*, 19-12685, 2022 WL 2704358, at *4 (11th Cir. July 12, 2022)). The Government argues that Defendant carried out a scheme to defraud that targeted traditional property interests by making material misrepresentations in PPP and EIDL loan applications and in supporting documents in order to obtain loan proceeds, i.e. money, from the banks and the SBA to which he was not entitled. ECF No. [214] at 5. In addition, the SBA served as a guarantor for the loans, paid back loan amounts with interest if and when the loans were forgiven, for instance in 2021 when SBA reimbursed WebBank after it forgave Defendant's May 2020 PPP loan amount (plus interest). ECF No. [214] at 6.

According to the Wire Fraud statute:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both….

18 U.S.C. § 1343.

A Wire Fraud conviction under 18 U.S.C. § 1343 requires "a person (1) intentionally participate[] in a scheme or artifice to defraud another of money or property, and (2) uses or

'causes' the use of the [] wires for the purpose of executing the scheme or artifice." *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011).[6] "To gauge a defendant's intent to commit a fraudulent scheme, then, we must determine whether the defendant attempted to obtain, by deceptive means, something to which he was not entitled." *Id.* at 1240.

The Court starts with Defendant's argument that the banks were not harmed and received merely what they bargained for, following the Eleventh Circuit's decision in *Takhalov*. In *Takhalov*, defendants had hired women to pose as tourists and lure visiting businessmen into defendants' bars and night clubs. *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. YEAR), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). Defendants were convicted of wire fraud under the wire fraud statute, 18. U.S.C. § 1343. The government argued that the women's "concealment of their bar-affiliation to the men were material misrepresentations sufficient to constitute fraud." *Takhalov*, 827 F.3d at 1311. The Eleventh Circuit held that the businessmen got exactly what they bargained for — a drink with a woman at a club — so that the misrepresentation did not go to the nature of the bargain, and so did not constitute a scheme to defraud. The Eleventh Circuit explained that "if the defendant does not intend to harm the victim – to obtain, by deceptive means, something to which [the defendant] is not entitled – then he has not intended to defraud the victim." *Id.* at 1313. "[A] 'scheme to defraud,' as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself." *Id.* Indeed,

> § 1343 forbids only schemes to *defraud*, not schemes to do other wicked things, *e.g.*, schemes to lie, trick, or otherwise deceive. The difference, of course, is that deceiving does not always involve harming another person; defrauding does. That

[6] "The first element, a scheme or artifice to defraud, 'requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property.' *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir.2009) (emphasis added). 'A misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed.' *Id.* (internal quotations and alteration omitted)." *United States v. Bradley*, 644 F.3d 1213, 1238–39 (11th Cir. 2011).

> a defendant merely "induce[d] [the victim] to enter into [a] transaction" that he otherwise would have avoided is therefore "insufficient" to show wire fraud.

*Id.* at 1310. As the Eleventh Circuit later reiterated:

> In a scheme to deceive, the victim of the lie hasn't been harmed because he still received what he paid for. But in a scheme to defraud, the victim has been harmed because the misrepresentation affected the nature of the bargain, either because the perpetrator lied about the value of the thing (for example, promising something costs $10 when it actually costs $20), or because he lied about the thing itself (for example, promising a gemstone is a diamond when it is actually a cubic zirconium). Takhalov, 827 F.3d at 1313–14. Either way, though, the victim didn't get what he paid for.

*United States v. Waters*, 937 F.3d 1344, 1354 (11th Cir. 2019). Defendant argues that the banks are like the men in *Takhalov* and got exactly what they bargained for, so that Defendant's Wire Fraud convictions should be vacated. The Court disagrees.

First, in effect, Defendant argues that the banks have to have suffered "actual property harm" for a conviction to be sustained under the wire fraud statute. ECF No. [205] at 15. That is not what the text of the statute requires, which states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

13 U.S.C. § 1343.

That no actual harm is required for a conviction under § 1343 is further evidenced by the fact that even unexecuted schemes are punishable under the Wire Fraud statute:

> Significantly, the mail and wire fraud statutes 'punish unexecuted as well as executed schemes.' *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.1991). It is therefore unnecessary that the victim actually relies on the misrepresentation or omission; proof of intent to defraud is sufficient. *See id.* All that is necessary is that the scheme be reasonably calculated to deceive; the intent element of the crime is shown by the existence of the scheme. *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir.1973).

*Bradley*, 644 F.3d at 1239. "This means that the government can convict a person for mail or wire fraud even if his targeted victim never encountered the deception—or, if he encountered it, was not deceived." *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). It follows that there is no requirement that the banks were actually harmed for Defendant's wire fraud convictions to stand, nor for them to have faced "potential financial harm[.]" ECF No. [205] at 18. What matters is not actual harm, but whether or not Defendant had an "intent to harm, which means 'to obtain, by deceptive means, something to which [one] is not entitled.'" *United States v. Masino*, No. 18-15019, 2021 WL 3235301, at *8 (11th Cir. July 30, 2021). This means that a defendant must have "more than an intent to *deceive* in order to prove an intent to *defraud*." *Id.* (emphasis in original).[7]

Contrary to Defendant's argument, *Ciminelli* does not replace the intent to harm/defraud requirement with an actual harm requirement, but merely states that the language of the wire fraud statute applies so that the government "must prove not only that wire fraud defendants 'engaged in deception,' but also that money or property was 'an object of their fraud.'" *Ciminelli*, 598 U.S. at 312. There, the Supreme Court held that:

> the wire fraud statute reaches only traditional property interests. The right to

[7] In *Masino*, the Eleventh Circuit vacated defendants' conviction for wire fraud conspiracy under 18 U.S.C. § 1349 because there was no evidence "that the Masinos conspired to *harm* the charities by deceiving them about the bargain itself" when running a bingo parlor for charities in violation of Florida law. *United States v. Masino*, No. 18-15019, 2021 WL 3235301, at *9 (11th Cir. July 30, 2021) (emphasis in original). Because "there was no evidence that the Masinos ever collected—or conspired to collect—a penny more than the charities agreed to pay in the annual lease agreement" so "the evidence did not support a finding that the Masinos' conspiracy included an intent to defraud the charities; it supported only an intent to deceive the charities through misrepresentations that did not affect the value of the bargain." *Id.* at *10 (11th Cir. July 30, 2021). Instead,

> The conspiracy, rather, was aimed at misrepresenting whether employee compensation was solely for setup and cleanup, and whether the agreed-upon rent prices aligned with that of comparable locations in the local market. To support the jury's guilty verdict, there would have to be evidence that these deceptions would affect the price or the characteristics of the good being exchanged.
>
> *Id.*

> valuable economic information needed to make discretionary economic decisions is not a traditional property interest.

*Id.* at 316. In contrast, money (obtained from loan proceeds) is not only a traditional property interest, it is squarely covered by 13 U.S.C. § 1343's text which covers "obtaining *money* or property." 13 U.S.C. § 1343 (emphasis added).

Nor would Defendant repaying the loans negate Defendant's intent to harm the banks. ECF No. [218] at 2. The Eleventh Circuit clarified this point in *United States v. Kachkar*, No. 19-12685, 2022 WL 2704358, at *1 (11th Cir. July 12, 2022). In that case, Kachkar was convicted of eight counts of wire fraud by "obtain[ing] millions of dollars in loan funds by providing fake proof of collateral to a bank." *Id.* at *1. "Kachkar argued that he lacked intent to harm the bank because he sought out third-party financing to repay the loan." *Id.* at *5. The Eleventh Circuit found that this reasoning was insufficient, because:

> Under *Takhalov*, the term "harm" does not necessarily refer to a long-term financial loss on the part of the victim. See 827 F.3d at 1313–14. Instead, a "harm" occurs when the misrepresentation affects the victim's understanding of the nature or value of the bargain. *Id.*; *Waters*, 937 F.3d at 1353–54. If a defendant intends to make such a misrepresentation, it does not matter whether he intends to make up for any loss later. It is therefore irrelevant for purposes of *Takhalov* that Kachkar intended to secure third-party repayment on the loan.

*Kachkar*, No. 19-12685, 2022 WL 2704358, at *5.

Unlike in *Takhalov*, Defendant's misrepresentation as to his businesses' eligibility for loans affected the banks' understanding of the nature of the bargain. Though Defendant argues that the banks received the value of their bargain and even stood to gain financially by making the loans, ECF No. [205] at 18, this reasoning is foreclosed by binding Eleventh Circuit precedent. After *Takhalov*, the Eleventh Circuit dismissed an argument that a bank has "no interest in truly knowing who it is lending its money to or what purposes they intend to put the money towards[,]" by a defendant who sought to vacate his bank fraud loan conviction under 18 U.S.C. § 1344. The

Eleventh Circuit explained that "[b]anks have a clear interest in knowing to whom they are loaning money and for what purpose. Indeed, such information goes to the very nature of the 'bargain' itself, as banks are not willing to provide loans to anyone and everyone, or for every purpose." *United States v. Watkins*, 42 F.4th 1278, 1286–87 (11th Cir. 2022), *cert. denied*, 143 S. Ct. 1754 (2023), and *cert. denied*, 143 S. Ct. 1754 (2023).

The Court also declines to find that money obtained from loan proceeds is not a traditional property interest under *Ciminelli*. Defendant does not seriously attempt to establish that what he obtained from banks — loan proceeds— is not a traditional property interest. As this Court previously found, "Sheppard does not argue, nor can he, that loan proceeds are not 'money or property' within the meaning of the Wire Fraud statute. *See, e.g., United States v. Vernon*, 593 F. App'x 883, 889 (11th Cir. 2014) (finding the government provided sufficient evidence of defendant's intent to participate in a scheme to defraud as part of a wire fraud where defendant received $114,211.33 in loan proceeds)." ECF No. [170] at 7.

Because the Court finds that Defendant's conviction as to Counts 5, 7, 8, and 9 can be upheld under a bank-as-victims theory, the Court does not reach the question of whether SBA was harmed or the Defendant's arguments as to regulatory interests. Accordingly, Defendant's Motion for Acquittal, ECF No. [205], is denied as to Counts 5, 7, 8, and 9.

**ii. Sufficiency of Wire Fraud Evidence**

Next, the Court turns to Defendant's argument that there was not enough evidence to sustain his conviction for Wire Fraud under Counts 5, 7, 8, and 9 of the Superseding Indictment.

First, Defendant argued that the Government did not sufficiently connect the 940, 941 and 1065 forms at issue to Defendant: the tie to Defendant was only supported by the "speculative and unsupported testimony" of the Government's handwriting expert, Graff. ECF No. [205] at 18. The Government responds that the evidence at trial was sufficient to convict the defendant of wire

fraud under Counts 5, 7, 8, and 9. ECF No. [214] at 3, 10-11. The Government is correct that there was substantial evidence connecting the forms at issue in the fraud to Defendant, such as that (1) Defendant was the sole signatory on the bank accounts that received the PPP funds, which funds he controlled and spent as he saw fit; (2) Defendant's personal information was provided for all of the loan applications, including his phone number, email address, home or office address, and copy of his driver's license; (3) communications between lenders and the loan applicant were with Defendant's email address; and (4) the loan applications were sent from Defendant's IP address. ECF No. [214] at 10. There is sufficient evidence to connect Defendant to the wire fraud. This is especially true in light of the fact that, as the Government correctly states, a Wire Fraud conviction requires only that the Defendant "transmits or causes to be transmitted" fraudulent material, and does not require transmission by the Defendant himself. 18 U.S.C. § 1343.

Second, Defendant argues as to Count 8 that the falsified 1065 form was not material in any way because the form was not even consulted in the loan approval process. ECF No. [205] at 19. The Government reiterates its previous argument that there is sufficient evidence to support Defendant's conviction under Count 8. ECF No. [214] at 10.

> To sustain a conviction for wire fraud, under 18 U.S.C. § 1343, the government must prove that the defendant: (1) participated in a scheme or artifice to defraud; (2) with the intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud.

*United States v. Machado*, 886 F.3d 1070, 1082–83 (11th Cir. 2018) (citation omitted). "A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). "A misrepresentation is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.'" *Id.*

However, Defendant's interpretation that to be material, the form has to be consulted is incorrect. That argument is foreclosed by Eleventh Circuit precedent. "Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement." *See United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999) (citation omitted). Moreover, the case Defendant cites for its definition of materiality pertains to a different statute, 18 U.S.C. § 1001, false statements in an offense involving international and domestic terrorism. ECF No. [205] at 19 (citing *United States v. Boffil-Rivera*, 607 F.3d 736, 742 (11th Cir. 2010)). The case is inapposite, as it recognizes that "the statement does not have to be relied upon and can be material even if it is ignored and never read." *Boffil-Rivera*, 607 F.3d at 742. The form 1065 sent as part of a fraudulent PPP loan application on behalf of Alafaya Trails submitted to Northeast Bank in Count 8 was capable of influencing a decision, namely the loan approval — regardless of whether it actually influenced the decision in the instant case.

Third, Defendant also argues that the Government did not adduce sufficient evidence to establish that Sheppard filled out the loan application for the Wire Fraud charged in Count 9, which were tied to the IP address in Sheppard's home office. ECF No. [205] at 19-20. Defendant argues that the Government failed to put on evidence that Defendant was the person who filled out the information from his home office. *Id.* The Government reiterates its argument that there was sufficient evidence. ECF No. [214] at 3, 10-11. The Court agrees with the Government. In a motion for acquittal, the Court must make "[a]ll credibility choices … in support of the jury's verdict." *Williams*, 390 F.3d at 1323. It is certainly credible that Defendant was the individual submitting loan applications for his companies from his home office IP address. Acquittal is not warranted under this argument as "a reasonable trier of fact could find that the evidence establishes guilt

beyond a reasonable doubt." *Id.* at 1324.

Finally, Defendant argues that the Government failed to establish that the workers were "independent contractors[,]" which would have made Defendant's company ineligible for PPP loans. ECF No. [205] at 20. The Government responds that it properly introduced evidence that Defendant's companies had paid zero in wages and employee compensation prior to the PPP loans, which was the relevant inquiry. ECF No. [214] at 11. The Government argues that the PPP loans were to cover 2.5 months of a business's employee wages and related compensation, so the relevant inquiry was focused on the defendant's companies prior wages, which the Government properly established to be zero or otherwise insufficient for PPP eligibility — and not whether Defendant's workers classified as "independent contractors." ECF No. [214] at 11.

The record demonstrates that the Government introduced evidence that Alafaya Trails (Count 5, 7, 8) and HMMD (Count 9) did not pay the wages and salaries that would have rendered him eligible for PPP loans. *See* 2018 Form 1065 for Alafaya Trails, Government Exhibit 30-1 at 7; 2019 Form 1065 for Alafaya Trails, Government Exhibit No. 30-2 at 8; 2020 Form 1065 for Alafaya Trails, Government Exhibit No. 30-3 at 8 (showing no wages and salaries for Alafaya Trails); IRS certification of lack of record for HMMD for years 2019, 2020 and 2021, Government Exhibit 12-5; 2019 HMMD Form 1065, Government Exhibit 12-1 at 1 (showing only $134,811 in wages); 2018 HMMD Form 940, Government Exhibit 12-2 (showing only $ 135,926.38 in payments made to employees); 2018 HMMD Form 941, Government Exhibit 12-3 (reporting only $36,123.78 in wages). That is sufficient to establish that the Defendant was not properly eligible for a PPP loan and to sustain his Wire Fraud conviction. The Government did not need to introduce further evidence that Alafaya Trails and HMMD's workers were independent contractors as opposed to bona fide employees.

Accordingly, there is enough evidence to sustain Defendant's conviction for wire fraud

under Counts 5, 7, 8, and 9 of the Superseding Indictment, ECF No. [60].

**B. Motion to Dismiss for Prosecutorial Misconduct or for New Trial**

Next, the Court turns to Defendant's Motion to Dismiss for Prosecutorial Misconduct or, in the Alternative, for New Trial Under Rule 33, ECF No. [204]. Defendant presents numerous arguments for a new trial, most of which are evidentiary challenges. "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Tucker v. Hous. Auth. of Birmingham Dist.*, 229 F. App'x 820, 826 (11th Cir. 2007). Moreover, the Court has already addressed those arguments in its Order on Motion *In Limine* Regarding Rule 404(b) Notice, ECF No. [123], or during the course of trial. The Defendant presents no additional arguments or law persuading the Court to alter its previous rulings. This is not a case where "the evidence [] preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Witt*, 43 F.4th 1188, 1194 (11th Cir. 2022). The Government has introduced sufficient evidence to sustain Defendant's conviction for wire fraud for submitting falsified tax records. Accordingly, and as further detailed below, Defendant does not carry his heavy burden to show that it this one the "really exceptional cases" warranting the grant of a new trial. *Brown*, 934 F.3d at 1297.

First, Defendant argues that the Court erred by: (1) admitting 404(b) evidence from Mr. Graff relating to Defendant forging Graff's signature in prior instances, and then limiting the defense's cross-examination of Mr. Graff. ECF No. [204] at 1-2. The Government responds that these issues were carefully weighed by the Court in its order on Defendant's Motion *in Limine*, ECF No. [123]. The Court has previously rejected this contention both in its order, ECF No. [123] and at trial. As this Court previously ruled, the 404(b) evidence could be introduced insofar as that evidence was relevant to Defendant's intent in allegedly committing the charged offenses, here lack of mistake. ECF No. [123] at 7. Under the text of Rule 404(b)(2), evidence of past wrongs

"may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Moreover, upon the admission of the evidence, Defendant had the opportunity to cross-examine Graff as to the speculative nature of Graff's handwriting testimony, as Defendant itself indicates in reply. ECF No. [219] at 3. The Court did not err by admitting 404(b) evidence from Mr. Graff relating to Defendant forging Graff's signature in prior instances.

Second, Defendant argues that the Court erred by admitting evidence regarding uncharged loans, resulting in a variance from the Superseding Indictment, ECF No. [60]. ECF No. [204] at 6-8. The Government argues the Court did not err by admitting evidence of false, uncharged loan applications as these were intrinsic to the charged scheme to defraud. ECF No. [215] at 8-13 (quoting *United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008)). Defendant replies that each loan was a separate transaction, and the loans were not inextricably intertwined. ECF No. [219] at 5-6. Defendant adds that the Government should have sought to introduce them as 404(b) evidence. *Id*. at 7. As discussed on the record, the Government sought to introduce evidence of Defendant attempting to modify and increase loans outside the dates of the Superseding Indictment to establish Defendant's intent to defraud. The Court allowed only loans submitted during the period of time of the scheme to defraud charged in the Superseding Indictment to be introduced, relying on case law offered by the parties. *Morris v. United States*, 112 F.2d 522, 528 (5th Cir. 1940) ("It is now well settled that as to crimes wherein fraudulent intent is one of the material allegations of the indictment, evidence of other and similar adventures of the defendant at or about the same time is properly admissible as bearing on the question of intent"); *United States v. Davis*, 172 F. App'x 175, 177 (9th Cir. 2006) ("The loans can be considered inextricably intertwined with an ongoing scheme to defraud HUD and do not constitute 'other acts' evidence under Fed.R.Evid.

404(b).").[8] Defendant cites no new law or justification for why the Court erred when it admitted the evidence of loans that occurred during the charged conduct.

Second, Defendant argues that the Court erred by dismissing a juror without cause near the end of trial, over Defendant's repeated objections. ECF No. [204] at 8-9. The Government responds that the juror's dismissal was proper: the juror had to accompany his wife, who had cancer and broken vertebrae, and needed emergency back surgery at numerous doctors' appointments which had a significant impact on the juror's ability to serve and on the Court's ability to continue trial. ECF No. [215] at 14-15. "A district court may remove and replace a seated juror before deliberations begin whenever 'facts arise … that cast doubt on [that] juror's ability to perform her duties.'" *United States v. Godwin*, 765 F.3d 1306, 1316 (11th Cir. 2014). Though Defendant is correct that the juror had initially indicated that attending the health appointments of his ailing wife would not distract him or prevent him from serving on the jury, the juror also indicated that that could change within the day or hour. The following day, it became apparent that the Court had to interrupt trial for various portions of time on a near-daily basis that week to accommodate the juror's demanding schedule. Given that, the Court properly dismissed the juror and replaced him with an alternate juror. Here, the Court's dismissal of a juror who had to attend to great personal responsibilities pertaining to serious health conditions suffered by his spouse, which could not be accommodated during the course of trial, was proper. In a footnote, Defendant requests leave to interview the juror. ECF No. [219] at 9 n. 12. Defendant cites no basis for such a request, and the request is accordingly denied.

Third, Defendant argues that the Court erred by admitting evidence of Defendant's alleged and uncharged tax violations, Defendant's failure to pay bills, as well as other inadmissible

---

[8] Contrary to Defendant's contention, the case was eventually identified as being from the Ninth Circuit on the record.

evidence of "bad character." ECF No. [204] at 9-10. Defendant argues that the Government's IRS expert spent substantial time testifying about Defendant's other alleged tax violations, which went far outside the scope of his expert disclosure. *Id.* The Government responds that the expert did not testify about tax crimes by Defendant but testified about the payroll and income tax records that the Defendant's businesses had filed or not filed with the IRS in order to demonstrate that the tax returns the defendant submitted to the lenders to support his PPP loan applications were false and fraudulent. ECF No. [215] at 15. Moreover, the Defendant's own tax returns were relevant as income and losses from partnerships get reported on the partner's personal income tax return. ECF No. [215] at 16. The Court agrees with its previous rulings and finds Defendant's business and personal tax records were admissible insofar as they related to a central issue at trial, namely whether Defendant had submitted fraudulent tax returns.

Fourth, Defendant argues the Court erred by denying re-cross examination of key witnesses after the government raised new issues, for the first time, during re-direct examination and by limiting the defense's cross-examination of key witnesses on material issues. ECF No. [204] at 11-12. For instance, the Court erred when it prevented questioning on one witness, Beirne, as to judgments against him for fraud and his own bankruptcy case as impeachment evidence. The Government responds that the Defendant was able to cross-examine at length relevant witnesses. ECF No. [215] at 17-18. Regarding Beirne, the Government argues that extrinsic evidence as Federal Rule of Evidence 608(b) allows a witness, on cross-examination, to be asked about "specific instances of a witness's conduct" if it is "probative of the character for truthfulness or untruthfulness." ECF No. [215] at 19. Asking the witness whether he had 22 pending lawsuits is not a specific instance that is probative of anything, much less the witness's character for truthfulness, where the lawsuits only included a civil complaint and a settlement agreement. *Id.* at 19-20.

The Court did not err when it limited the scope of re-cross examination. The Defendant similarly fails to establish that the Court erred when it denied re-cross examination subject to the Government purportedly introducing a new theory on cross examination. "Subject to the Sixth Amendment, the trial court has discretion to limit re-cross examination…. A defendant nonetheless does have a limited right to re-cross examination where a new matter is brought out on redirect examination." *United States v. Ross*, 33 F.3d 1507, 1518 (11th Cir. 1994). Defendant fails to establish what new theory warranted the re-cross examination of two witnesses in the case. Moreover, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The Court did not err when it declined re-cross examination on the testimony of two witnesses.

The Court did not err when it declined to admit complaints or settlement agreement as to Beirne. Under Rule 608(b),

> extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about.
>
> Fed. R. Evid. 608(b).

Based on Defense counsel's characterization of the evidence in the record, the evidence pertained to pending civil lawsuits that were settled, including on bankruptcy issues. Defense counsel conceded that the only evidence of fraud of a criminal or civil nature were allegations made in complaints and inadmissible settlement agreements. The Court sees no reason to alter its prior ruling that such extrinsic evidence is either not probative of truthfulness and accordingly

inadmissible under Rule 608(b).

Sixth, Defendant argues that Prosecutors committed misconduct in a variety of situations, ECF No. [204] at 13-15, none of which have merit. Defendant argues that such misconduct occurred when the Government suggested in rebuttal that Defendant forged Graff's signature and, if he had forged before, he would do it again. *Id.* at 15. Such evidence of forgery was speculative. ECF No. [219] at 3. Defendant also argues that the Court erred by overruling the Defendant's objections to the Government's closing argument and not granting a mistrial based upon the Government's misconduct, when the Government represented to the Court that it would not use the alleged 404(b) evidence pertaining to Graff to show propensity. ECF No. [204] at 12-13. The Government responds that Prosecutors made no improper remarks during closing argument, and any error in their closing arguments constitutes harmless error because there was overwhelming evidence of the Defendant's guilt. ECF No. [215] at 20-21. The Court read to jurors instructions before the parties' closing arguments, which included the Rule 404(b) instruction, and the Prosecutor properly mentioned the Rule 404(b) evidence on rebuttal to establish absence of mistake. *Id.* at 21.

The Court is not persuaded that prosecutorial misconduct occurred when the Government mentioned Defendant's prior forgery of Graff's signature in rebuttal. During rebuttal, the Government told the jury that the prior forgery by Graff was being introduced to show that Defendant's forgeries of signature in the Counts listed in the indictment were not a mistake. Introducing 404(b) to establish "absence of mistake" is proper under Rule 404(b). *See* Fed. R. Evid. 404(b). For a finding of prosecutorial misconduct, "(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Sosa*, 777 F.3d 1279, 1294 (11th Cir. 2015) (quoting *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006)). "'A defendant's substantial rights are prejudicially affected when a reasonable

probability arises that, but for the remarks, the outcome of the trial would have been different. When the record contains sufficient independent evidence of guilt, any error is harmless.'" *Id.* The first requirement for prosecutorial misconduct is not met: this was not an improper remark establishing prosecutorial misconduct.

Ultimately, "motions for a new trial are committed to the discretion of the trial court." *Noga*, 168 F.3d at 1295. A new trial is not warranted in this case..

Accordingly, Defendant's Motion to Dismiss for Prosecutorial Misconduct, or, in the Alternative, for a New Trial, ECF No. [204], is denied.

**C. Motion for Release Pending Appeal or for Self-Surrender**

Defendant requests this Court permit his continued release pending resolution of a timely-filed appeal, as Defendant is not likely to flee or pose a danger to the community, and his appeal is not intended to delay and raises substantial questions. ECF No. [240]. The Government opposes the release pending resolution of an appeal, and argues Defendant has not established he is not likely to flee and that the appeal raises a substantial question of law. ECF No. [245]. Defendant replies that his preexisting family ties in South Florida, regular doctor appointments, and minor child at home make clear he is not likely to flee. ECF No. [249] at 2-4.

Section 3143(b)(1) and (2) require this Court to release a defendant on bond pending appeal if four conditions are met:

(1) the defendant is not a flight risk or danger to the community;

(2) the appeal is not for the purpose of delay; and

(3) the appeal raises a substantial question of law or fact that

(4) is likely to result in reversal or a more favorable sentence.

*See* 18 U.S.C. § 3143(b).[9]

The Court declines to release Defendant on bond pending his appeal. In this Order, the Court has acquitted Defendant on two counts, and carefully drew from Eleventh Circuit precedent when determining (a) to acquit Defendant on Counts 13 and 14 on Aggravated Identity Theft and (b) not to acquit Defendant on Counts 5, 7, 8, and 9 of the Superseding Indictment. Though the Court agrees with Defendant that the issue of Defendant's conviction for aggravated identity theft presented a "substantial question of law" under 18 U.S.C. § 3143(b)(1)(B), the Court resolved that issue in Defendant's favor. Any reversal on appeal on Counts 13 and 14 for Aggravated Identity Theft would lead to a longer sentence for Defendant, so would not lead to a more favorable sentence under 18 U.S.C. § 3143(b)(1)(B)(iv).

A substantial question "is a 'close' question or one that very well could be decided the other way." *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985). Defendant's argument

---

[9] The text of the statute states as follows:
(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—
(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
(i) reversal,
(ii) an order for a new trial,
(iii) a sentence that does not include a term of imprisonment, or
(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.
(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.
18 U.S.C. § 3143(b).

for acquittal under Counts 5, 7, 8, and 9 for wire fraud is foreclosed by Eleventh Circuit precedent so it does not present a substantial question of law under 18 U.S.C. § 3143(b)(1)(B), as it is not a close question that could be decided the other way. Defendant's proposition that *Watkins* is inapplicable because not all loan contexts are the same is not supported by the case law. ECF No. [249] at 6; *Watkins*, 42 F.4th at 1286-87. It is insufficient to make the Defendant's argument on the wire fraud counts a substantial question of law. The Court agrees with the Government that "the facts of this case do not raise a *Takhalov* issue." ECF No. [245] at 5.

However, Defendant is authorized to self-surrender to the Bureau of Prisons, to be discussed at the time of his sentencing hearing.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Judgment of Acquittal**, ECF No. [205]**, is **GRANTED IN PART** and **DENIED IN PART**.
    i. Defendant's Motion for Judgment of Acquittal is **GRANTED** as to Counts 13 and 14 of the Superseding Indictment.
    ii. Defendant is **ACQUITTED** of Counts 13 and 14 of the Superseding Indictment for aggravated identity theft.
    iii. Defendant's Motion for Judgment of Acquittal is **DENIED** as to Defendant's conviction for Wire Fraud under Counts 5, 7, 8, and 9 of the Superseding Indictment.
2. Defendant's Motion for a New Trial, **ECF No. [204]**, is **DENIED**.
3. Defendant's Provisional Motion for Release Pending Appeal, or in the Alternative, for Self-Surrender, ECF No. [240], is **GRANTED IN PART** and **DENIED IN PART**.

4. The Court's previous order on its previous Motion for Acquittal, ECF No. [170], is **VACATED IN PART** as to the Court's reasoning as to Aggravated Identity Theft under *Dubin v. United States*, 599 U.S. 110, 114 (2023).

**DONE AND ORDERED** in Chambers at Miami, Florida on June 3, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record